Argued and submitted December 21, 2017, affirmed October 16, 2019

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

KELLY SUZETTE SASSARINI,
*Defendant-Appellant.*

Curry County Circuit Court
15CR0292; A162811

452 P3d 457

Defendant appeals a judgment of conviction for harassment that arose out of a confrontation with a neighbor who was recording some of the incident with a video camera. The neighbor provided police with a DVD that included what he represented to be digital recordings from the confrontation. The issues on appeal involve the digital copies on the DVD, which was eventually admitted at trial and played for the jury. Defendant argues that the trial court committed two errors: first, denying her motion for a continuance to allow her forensic expert to examine the camera and its memory card, to compare the metadata of the files on the memory card with those on the DVD; and, second, admitting the digital recordings on the DVD over her objection that the state had failed to demonstrate their authenticity. *Held*: Under the circumstances, where defendant made a tactical decision to attack the state's inability to establish a chain of custody for copies of the recordings rather than obtain the memory card or camera, the trial court did not abuse its discretion in denying the motion for a continuance. Nor did the court err in concluding that the state met the threshold to send the question of authentication to the jury. The state presented sufficient evidence about the circumstances of the recordings that a factfinder could believe that they were accurate and reliable depictions of the incident and had not been edited by the neighbor who took them; defendant's expert's testimony, although raising certain irregularities in the metadata, did not so seriously discredit the authenticity of the recordings that no factfinder could have confidence in them.

Affirmed.

Jesse C. Margolis, Judge.

Jesse Wm. Barton argued the cause and filed the briefs for appellant.

Jeff J. Payne, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Lagesen, Presiding Judge, and DeVore, Judge, and James, Judge.

JAMES, J.

Affirmed.

**JAMES, J.**

Defendant appeals a judgment of conviction for harassment that arose out of a confrontation with a neighbor who was recording some of the incident with a video camera. The neighbor provided police with a DVD that included what he represented to be digital recordings from the confrontation. The issues on appeal involve the digital copies on the DVD, which was eventually admitted at trial and played for the jury. Defendant argues that the trial court committed two errors: first, denying her motion for a continuance to allow her forensic expert to examine the camera and its memory card, to compare the metadata of the files on the memory card with those on the DVD; and, second, admitting the digital recordings on the DVD over her objection that the state had failed to demonstrate their authenticity. For the reasons explained below, we hold that, under the circumstances, the trial court did not abuse its discretion in denying the motion for a continuance, and that the state presented evidence sufficient to support a finding that the DVD included authentic copies of the camera's digital recordings. We therefore affirm.

## BACKGROUND

We begin with a summary of the historical context in which the charges and the procedural and evidentiary questions arose. Defendant and Walker were neighbors in a rural area. Their relationship soured over several months, first because of disputes about dogs running loose on defendant's property, and then about defendant's effort to construct a fence, which Walker believed was violating deed restrictions and being built on land that was not defendant's.

Those disputes culminated in a physical altercation between the two on the morning of June 10, 2014, over the dismantling of an old gate at the site where the new fencing was being built. Deputy McAllister responded to a disturbance call and found Walker at home. Walker was bleeding from his lower right leg, and he reported that defendant had come from behind him, kicked him in the leg, and knocked him to the ground; while he was on the ground, defendant grabbed his hair and shoved his face into the dirt. He further reported that, after the assault, defendant's partner,

Johnson, had reached inside Walker's car, removed the keys from the ignition, and thrown them into the brush, which required Walker to crawl through the brush back to his home. Walker told McAllister that he had a video camera with him during the incident, but McAllister did not seize the camera at that time.

McAllister got a different story from defendant. Defendant told him that Walker was yelling in her face, that she felt threatened, and that she grabbed Walker by the hair and "laid" him down to the ground. She denied causing any injuries and surmised that he injured his leg while returning home. Defendant said that Johnson had taken Walker's keys and thrown them out of fear that Walker would use the car as a weapon.

The next day, Walker told McAllister that he had camera recordings of the assault to show him. McAllister returned to Walker's home, and Walker played three digital files on his home computer (through another machine, which we will discuss later). The first file was a 34-second video that shows Walker approaching a closed gate on a road, and defendant to the right of her truck with a gun. The second file was a video less than a second long, which shows little of anything. The third file was a video that shows only color bars and 20 seconds of audio.

After playing the files for McAllister, Walker provided him with a DVD that purportedly contained digital copies that Walker had made of those files. That DVD was defective, however, and the video was distorted when police attempted to play it. Four days later, Walker provided McAllister with a second DVD, again purportedly copies of the same three files that Walker had played for McAllister. McAllister booked that DVD into evidence.

Defendant was eventually charged with fourth-degree assault and harassment. During discovery, the state provided defendant with a copy of the digital files on the DVD that McAllister booked. On July 10, 2016, four days before the scheduled trial date, defendant filed a motion *in limine* to exclude the recordings on the DVD, "on the grounds that the state cannot prove an adequate foundation to establish the chain of custody, and on the further grounds that

the state cannot adequately authenticate the recordings as required by OEC 901." In a memorandum in support of her motion, defendant explained that five days passed between the incident and when Walker provided the DVD, that there were three files rather than the single video of the incident that one would expect, and that the state could not establish a chain of custody for the videos. Defendant also explained that she had sent the files to an expert in analyzing the authenticity of audio and video files, Edward Primeau, who "concluded that the three files are not authentic, original digital video recordings." Defendant attached Primeau's report, which stated, "Because no information was given about the device or the handling of the evidence, I cannot determine the authenticity of the chain of custody."

The motion *in limine* was heard on the day scheduled for trial. To establish the chain of custody, the state called Walker as its first witness and elicited testimony identifying the Sony XD Cam he used to record the videos. The state then sought to admit the camera as an exhibit, but defendant objected on the ground that only the DVD—and not the camera itself—had been produced by the state during discovery:

> "[W]e object in that this is the first time we've known this camera actually exists. We—I did have a communication with [the prosecutor] some months ago to determine that the three files that we had was all that was in the—in the State's evidence. We—we were never informed, as you've read my—my expert's report, is that having the camera, uh, and knowing what type of camera it is, is an essential part of doing his analysis, uh, so I would object to the admission of the camera simply because we haven't had an opportunity to examine it or to have my expert examine it."

The trial court overruled the objection and admitted the exhibit for the purposes of the hearing. Nonetheless, the prosecutor at that point interjected, "And, Your Honor, just for the record, *** today is the first time the State has seen this camera. I asked that it be brought in today, given the nature of the hearing."

The prosecutor then handed Walker the DVD that McAllister had booked into evidence, which was marked as

Exhibit 1. Walker testified that he had viewed the contents of that DVD and that it was "an accurate representation of what happened" on the day of the altercation, both "visually" and "audibly." When the state then offered Exhibit 1, defendant asked that it first be played in court so that she could decide whether to object to it being received.

After Exhibit 1 was played in court, defendant voiced a concern that it was not the same as the DVD she had received during discovery. She explained that, whereas all three videos on Exhibit 1 played continuously, the videos on her copy did not. The court then asked the prosecutor about the creation of the copy provided to defendant, and he explained that the sheriff's office had combined the videos from Walker and a separate video from the deputy's in-car camera onto a single DVD to provide to defendant. At that point, the trial court surmised that some of the authenticity issues identified in Primeau's report could be attributed to the process used by the sheriff's office to copy the files, and that those concerns could be put to rest by comparing the three versions of the videos: the state's DVD (Exhibit 1), defendant's DVD, and the version on the memory card of the camera.

After defendant again pointed out that her expert had not had an opportunity to review "whatever the sheriff's department received before they put it through their software," the court stated:

> "Well, that's a different issue. I guess—I don't recall seeing a motion to compel or any discovery issue coming up before. The camera is here now. We can look at what's on the camera.
>
> "* * * * *
>
> "My concern—my concern is whether or not what the State wants to show to be authenticated for purposes of this hearing and the chain of custody issue is important too but *if the video that's on the camera and the video that's on the DVD, visually to me it looks the same, there's probably not a lot to argue about. If it's different then your point will be well taken.*"

(Emphasis added.)

Defendant reiterated that her expert had not had a chance to examine the "metadata underneath" the files and that she was only learning now, "at this late date that there was actually \*\*\* a file that was created in there [the camera] that was somehow transferred to another DVD that was transferred several times." The court again dismissed that concern based on the fact that defendant should have been aware of the existence of an original recording device but never pursued the discovery issue:

> "[That file creation/transfer process] is common and I'm quite certain that you are aware that some sort of device recorded this video and there's no discovery or motion to compel regarding getting your hands on the device that's in the court file. So, I'm not really concerned with the fact that that wasn't provided to you before—even if you asked the DA's office for it, you didn't deal with that prior to trial."

After further colloquy about whether defendant had asked the state for the "video file itself that came out of the camera," the court adhered to its view that it would not "deal with your discovery issues at this point" and that they would play defendant's DVD to compare it to the state's Exhibit 1.

After defendant's DVD was played, the court asked whether the prosecutor could also "play what's on the camera" and encouraged him to ask Walker about that possibility. The prosecutor then returned to his examination of Walker, beginning with questions about what had just been played in court. Walker testified that the recording "absolutely" matched the original recordings on his video camera. According to Walker, the camera was broken during the assault, and he removed the memory card from the camera on the night of the assault or early the next day. He then transferred the three files from the memory card to his computer through "Sony XD cam transfer," which he was able to play for McAllister. Walker testified that he took the "original"—meaning the memory card—to someone named Jason Lefebvre to transfer to a DVD for the sheriff's office, and that Walker then kept the memory card.

Eventually, the state played in court the video clips on the memory card through the camera's screen. Walker testified that he had not "in any way altered the digital images or vocal images that are recorded" on the camera.

Before cross-examining Walker, defendant asked for a recess to speak with her expert. After that break, defendant renewed her request for a longer recess—a week to allow her expert to examine the camera. After the court denied that motion, defendant asked for a recess for the rest of the morning. The court denied that request as well, stating that "[h]e can look at it during a break." The parties then had another extended discussion about what defendant had requested during discovery. The court asked, "Did you specifically ask for the metadata or the recording device?" Defense counsel responded, "Uh, no. We have the meta—we got the metadata because we—from the file—that's what my expert does."

The prosecutor acknowledged that defendant may have asked for the original recording but reiterated that he had never understood defendant to have requested the memory card or camera, which were not in the state's possession until that morning. He explained:

"And—and had I understood that they wanted to actually examine the—the camera and the original memory thing that we could have made some sort of an arrangement, but I—at least I didn't understand that. Maybe that's—maybe that's my fault. I don't know."

Defendant also asserted that she had requested "all exhibits and this is now become a—this will be an exhibit at the trial. So, certainly, I asked for those things in my initial request for discovery." The prosecutor responded that he was not intending to offer the camera and memory card at trial, but only the recordings on Exhibit 1, the state's DVD.

Defendant then cross-examined Walker. During that examination, Walker testified that the color bars, which appear on the third of the files, occurred when the camera was somehow jarred. Walker admitted that he could not explain the mechanism by which the color bars appeared.

Two other witnesses testified at the hearing on the motion *in limine*: McAllister and defendant's expert, Primeau. McAllister testified about observing the recordings at Walker's home as they were played through the Sony machine, and he testified that "the imagery that [he] observed then was the same as what was observed on

State's Exhibit 1 today." On cross-examination, he testified that he had no personal knowledge of what happened to the recordings between the time that he watched them at Walker's home on June 11 and when a disc was delivered to the sheriff's department on June 15. However, on redirect, McAllister testified that he had viewed the video delivered on June 15 and that it was "the same as the one [he] saw on the 11th" and "the same as State's Exhibit 1 today."

Primeau then testified about his review of defendant's DVD. He explained that, after watching the three videos on that DVD, he was suspicious that the color bars in the third video had been added through a menu on the camera or through an editing program. He was asked whether it was possible for color bars to automatically appear when a camera is dropped, and he responded, "I have not seen that before, no." This exchange with the court followed:

> "THE COURT:   So—hold on. You say you haven't seen that before or is it not possible? You answered both. Is that what you meant?
>
> "＊＊＊＊＊
>
> "MR PRIMEAU:   I don't know if it's possible, Your Honor. I would have to recreate that in order to be able to testify on that."

Later, Primeau explained that he was "not familiar with the Sony one" that Walker used but that, in most of the cameras Primeau had examined, the color bars do not appear automatically in the middle of a recording. When asked for his opinion on the origin of the color bars, Primeau stated: "Well, prior to today, my opinion was that I believed that they were added to the recording, post recording[.]"

Primeau also testified about his examination of the metadata of the files on defendant's DVD. He explained that "[m]etadata is like the back door to a digital video file. It has information about the file, uh, such as the equipment that created it, the date and time that it was created. The rate. The size of the video. The frame rate of the video. It's a lot of information that helps me be able to authenticate the video." Primeau explained that, using a tool known as an EXIF Interpreter, he was able to extract the metadata for the three

files and discovered a lack of information about the make and model of the camera and internal discrepancies in date and time readings—the date of June 9, 2014 (a day before the incident), along with the time of 9:59 appears "in several different displays within this reading" but "the first date at the top of the reading shows 6/9/2014, but it's 1 o'clock. So, we've got a conflict between 1 o'clock and 10:00 a.m."

The court asked Primeau about the significance of some of those discrepancies:

"THE COURT:   Well, it may be a concern but I'm trying to figure out why it's a concern and what that means for your testimony. With the different time, do you know why—can you say why it is that there's *** different time information on—in the metadata?

"MR. PRIMEAU:   No. Not without examining the original equipment that creat[ed] it.

"THE COURT:   So, you—you don't have an opinion about why it's different?

"MR. PRIMEAU:   It could be different because it was accessed at 1 o'clock in the afternoon. Maybe it was opened."

When asked for his ultimate opinion on the authenticity of the files, Primeau testified as follows:

"[DEFENSE COUNSEL]:   Sir, do you have an opinion then, uh, based on what you heard today, and based on the—the review that you've done of the files, do you have an opinion about whether or not the files that you reviewed, that were provided to us in discovery, were authentic?

"[PRIMEAU]:   The files that I reviewed prior to coming to testify today, that we were giv[en] on the disk, I had concern and did not believe they were authentic.

"[DEFENSE COUNSEL]:   Okay. And, uh, was there—and can you determine whether or not the files that we saw today are authentic without examining the camera and the original media?

"[PRIMEAU]:   No."

After Primeau testified, the parties argued the merits of the motion *in limine*. The state explained that Walker had testified that the DVD recordings on Exhibit 1

accurately depict what happened on the day of the incident; that McAllister had observed the recordings the day after the incident and said Exhibit 1 depicted the same recordings that he saw; and that Walker had been able to identify defendant and Johnson's voices on the recordings. Defendant responded that the state had left too many gaps in the chain of custody during the five days between the incident and when Exhibit 1 was in the state's hands, and that Primeau's testimony—that the metadata had changed and was internally inconsistent on defendant's version—demonstrated "an issue" with the video recording.

The court ruled that the state presented a sufficient showing of authenticity to send Exhibit 1 to the jury. The court explained that all of the videos looked the same on a video screen, even though the "metadata underlying that video is perhaps different." And, the court explained, the problems with the metadata did not themselves show that the video recording had been altered, particularly after the memory card was produced and its contents viewed:

> "The expert had some red flags, based upon the information that he had, \*\*\* but there are multiple reasons why the— for instance, the camera information might not be there or why this might be an .mp4 file, as opposed to another proprietary type of file. I think it was clear to the expert probably when he first started looking at the metadata that this was not the media taken from the camera directly. That's clear to everybody. But that's not necessarily a sign that this video has been tampered in a way that would impact its admissibility or reliability. There isn't really evidence from this hearing today that would convince the Court that that's what has happened and *that, again, is because of the memory card from the camera being produced as an exhibit here.* \*\*\* [T]here's not a showing that [the memory card was modified or changed] by the defense here. There is a showing that this is reliable, there's testimony or that this is an accurate recording. That showing has been made. *The jury can make the decision about whether \*\*\* the video recording is an accurate recording or not.* So, the video recording is admissible."

(Emphases added.)

Pursuant to the court's ruling, Exhibit 1 was later admitted at trial and played for the jury. The jury acquitted

defendant of fourth-degree assault but convicted her of harassment. She appeals the ensuing judgment of conviction.

## ANALYSIS

A.   *First Assignment of Error*

On appeal, defendant first assigns error to the trial court's denial of her motion for a continuance to allow time for her expert to analyze the camera and the memory card. According to defendant, she had no reason to know until the morning of the hearing on the motion *in limine* that the memory card existed. In her view, those "unanticipated circumstances" required the court to grant a continuance regardless of whether it was made on the day of trial, because the court's denial of her motion prevented her from adequately preparing and investigating her case. We disagree.

"We review a trial court's denial of a motion for continuance for abuse of discretion." *State v. Thomas*, 266 Or App 642, 643, 338 P3d 762 (2014). "[W]e determine the propriety of the motion by examining the circumstances of the case and the reasons presented to the court at the time that it denied the request." *State v. Stull*, 281 Or App 662, 667, 386 P3d 122 (2016), *rev den*, 360 Or 752 (2017); *see also State v. Kindler*, 277 Or App 242, 250, 370 P3d 909 (2016) (mindful of the "demands of managing trial dockets, we have historically been loath to second-guess trial courts' denials of motions for postponement or continuance").

Defendant is correct that "unanticipated circumstances" may require a trial court to grant a continuance, even on the date scheduled for trial. *See Phillips v. Premo*, 280 Or App 634, 637, 381 P3d 986 (2016) ("Unanticipated circumstances can arise, and a trial court cannot deny a motion for a continuance simply because the motion is made on the day of trial[.]"); *State v. Hickey*, 79 Or App 200, 203, 717 P2d 1287 (1986) (holding that the court should have granted a continuance where the attorney's case file had been stolen the night before trial). Here, however, defendant has not demonstrated the type of unanticipated circumstances that would have obligated the trial court to grant a continuance.

We begin by noting what defendant is *not* arguing. She is not arguing that a continuance was required because of a discovery or *Brady* violation by the state; she concedes that "until the date of the hearing, Walker, not the state, had the camera and the memory card." Nor is she arguing that the state had an obligation to obtain the original from Walker. Instead, she argues that there was no reason for her to have anticipated, and no way for her to have obtained, the evidence that was in Walker's possession before the hearing.

As the trial court repeatedly pointed out in its colloquy with counsel, defendant must have known that the DVD provided by the state was not the original source of the recordings; the camera was not likely to have recorded directly to a DVD, and her expert had identified the absence of and need for the original to establish authenticity of the copy. In short, defense counsel must have known that the copy in possession of the state, the same copy produced in discovery, was just that—a copy. But, rather than make any effort to obtain the original memory card and camera from Walker directly, or to confirm that the camera and memory card no longer existed, defendant instead made a tactical decision to attack the state's inability to establish a chain of custody for the copies that were made. The court was not required, under those circumstances, to relieve defendant of the consequences of her tactical decisions—particularly when there were available avenues for defendant to have sought the evidence. *See State v. Bray*, 363 Or 226, 251, 422 P3d 250 (2018) (stating that "ORS 136.580 provided a statutory basis for defendant's subpoena of [a witness's] computer and the digital evidence it contains").

The court also rejected defendant's suggestion that the prosecutor's responses to her discovery requests had led her to believe that the camera and memory card did not exist. The court determined that the prosecutor reasonably understood those requests to pertain to the recordings themselves and not the memory card or the camera, and the prosecutor had not misled defense counsel when communicating about the recordings. Those determinations about the parties' pretrial communications are not clearly against the evidence and reason. *Cf. Forsi v. Hildahl*, 194 Or App 648, 652, 96 P3d 852 (2004), *rev den*, 338 Or 124 (2005) ("The trial court

abuses its discretion if it exercises that discretion in a manner that is unjustified by, and clearly against, reason and evidence.").

In sum, the question before us is not whether, on this record, we would have denied the motion for a continuance to allow defendant's expert to examine the camera and memory card. Under our deferential standard of review, the question is whether the trial court acted outside the bounds of its discretion in determining that defendant should have sought production of the camera and memory card sooner rather than delaying trial in a misdemeanor case that was already over a year old. Under the totality of the circumstances, we cannot say that the trial court did so, and we therefore reject defendant's first assignment of error.

B.  *Second Assignment of Error*

In her second assignment, defendant argues that the trial court erred in denying her motion *in limine* to exclude the digital recordings. Defendant argues that the state failed to meet the burden for authenticating recordings under the multi-part test set forth in this court's decision in *State v. Miller*, 6 Or App 366, 487 P2d 1387 (1971). The state responds that *Miller* was superseded by the enactment of OEC 901, which now governs authentication and "merely requires the proponent to submit evidence 'sufficient to support a finding that the matter in question is what its proponent claims.'" (Quoting OEC 901(1).) For reasons we will explain, we conclude that neither party is wholly correct as to how OEC 901 and *Miller* apply in this circumstance. Nevertheless, we conclude that the trial court correctly ruled that the state's evidence was sufficient under OEC 901 to authenticate the digital recordings on Exhibit 1.

The parties' competing arguments regarding OEC 901 and *Miller* implicate one of the more challenging evidentiary questions of the modern world: When can we trust digital evidence? *See generally* Jill Witkowski, *Can Juries Really Believe What They See? New Foundational Requirements for the Authentication of Digital Images*, 10 Wash U J L & Pol'y 267 (2002); *accord State v. Mansor*, 363 Or 185, 198, 421 P3d 323 (2018) ("Sophisticated users can hide digital data in much more complex ways, including changing date

and time metadata and encrypting files so that they cannot be opened." (Citing Orin S. Kerr, *Executing Warrants for Digital Evidence: The case for use restrictions on nonresponsive data*, 48 Tex Tech L Rev 1, 16 (2015) ("Data can always be changed. Maybe the modification will be easy or maybe it will be hard. But it can always be done.").)). As Professor Kirkpatrick has observed,

> "With modern technology, particularly digitization, it has become easier to manipulate, distort and fabricate all forms of photographic imagery. Enlargements, filtered lenses, cropping, varied focal length, and changed lighting conditions provide opportunities for manipulation which may be detectable, if at all, only by a sophisticated viewer. For this reason, commentators have properly urged courts to exercise greater care and, in cases of doubt, to demand a stricter foundation for photographic evidence and sometimes to give the jury cautionary instructions."

Laird C. Kirkpatrick, *Oregon Evidence* § 901.04[2][e] at 956-57 (6th ed 2013). Our analysis, however, must be grounded in the Oregon Rules of Evidence.

In turning to those code provisions, it is important to distinguish between two related, but sometimes confused, concepts, one of which—authentication—is at issue in this case, and the other of which—originality—is not. Under OEC 1002, "[t]o prove the content of a writing, recording or photograph, the original writing, recording or photograph is required, except as otherwise provided in ORS 40.550 to 40.585 or other law." For purposes of that rule, the "'[o]riginal' of a writing or recording is the writing or recording itself or any counterpart intended to have the same effect by a person executing or issuing it." OEC 1001(2).

One of the listed exceptions in OEC 1002 to the requirement of an "original" is for "duplicates." A "duplicate" is "a counterpart produced by the same impression as the original, or from the same matrix, or by means of photography, including enlargements and miniatures, by mechanical or electronic re-recording, by chemical reproduction, by optical imaging or *by other equivalent techniques that accurately reproduce the original* * * *." OEC 1001(1) (emphasis added). Under OEC 1003,

"[a] duplicate is admissible to the same extent as an original unless:

"(1)   A genuine question is raised as to the authenticity of the original; or

"(2)   In the circumstances it would be unfair to admit the duplicate in lieu of the original."

In this case, the state sought to introduce digital copies of files on Exhibit 1 that were originally stored on the camera's memory card. Thus, the questions of admissibility are two-fold: First, are the digital files on the DVD "duplicates"—*i.e.*, are they accurate copies of the original files on the memory card. Second, if so, is there a genuine question raised as to the authenticity of the original files, or do the circumstances make it unfair to admit the recordings on the DVD in lieu of the files on the memory card?

Although defendant has not explicitly framed her arguments in those terms, we understand her challenge to be one related to the "authenticity of the original," and not whether Exhibit 1 is an accurate copy of what appears on the memory card or whether it was unfair under the circumstances to admit Exhibit 1 rather than the memory card itself. In her motion *in limine*, defendant challenged the "authenticity" of the video recordings without differentiating between the authenticity of the files on the memory card and the accuracy or authenticity of the process of duplication to the DVD. The implication from defendant's challenge was that Walker edited the videos at some point, either through the camera's menu or in an editing program on his computer, and that the state had not established that the recordings on Exhibit 1 were accurate depictions of the events during the incident.

At the hearing, however, the state offered the memory card and played the recordings directly from the memory card. The trial court watched the videos and concluded that they were the same clips that were depicted in Exhibit 1. That, along with testimony from Walker that the files were copied from the memory card without alteration and were provided to the state, is sufficient under the circumstances to establish that the three files on Exhibit 1 are accurate

copies and qualify as "duplicates" of what appeared on the memory card, and we do not understand defendant to contend otherwise on appeal.

Defendant's argument on appeal, instead, is that the state failed to prove that the "root source"—the files on the memory card—were authentic. That brings us to the parties' dispute over the requirements for authentication under OEC 901 and the continuing import of *Miller*.

OEC 901(1) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Subsection (2) then provides an illustrative list of ways that the requirements of subsection (1) are satisfied:

"(2)   By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of subsection (1) of this section:

"(a)   Testimony by a witness with knowledge that a matter is what it is claimed to be.

"(b)   Nonexpert opinion as to the genuineness of handwriting, based upon familiarity not acquired for purposes of the litigation.

"(c)   Comparison by the trier of fact or by expert witnesses with specimens which have been authenticated.

"(d)   Appearance, contents, substance, internal patterns or other distinctive characteristics, taken in conjunction with circumstances.

"(e)   Identification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker.

"(f)   Telephone conversations, by evidence that a call was made to the number assigned at the time by the telephone company to a particular person or business, if:

"(A)   In the case of a person, circumstances, including self-identification, show the person answering to be the one called; or

"(B)   In the case of a business, the call was made to a place of business and the conversation related to business reasonably transacted over the telephone.

"(g)   Evidence that a writing authorized by law to be recorded or filed and in fact recorded or filed in a public office, or a purported public record, report, statement, or data compilation, in any form, is from the public office where items of this nature are kept.

"(h)   Evidence that a document or data compilation, in any form:

"(A)   Is in such condition as to create no suspicion concerning its authenticity;

"(B)   Was in a place where it, if authentic, would likely be; and

"(C)   Has been in existence 20 years or more at the time it is offered.

"(i)   Evidence describing a process or system used to produce a result and showing that the process or system produces an accurate result.

"(j)   Any method of authentication or identification otherwise provided by law or by other rules prescribed by the Supreme Court."

The rule sets forth the "well-accepted requirement that whenever a piece of evidence is offered there must be certain minimum assurances that the evidence is what it purports to be, what it is offered as being[,] and what its value depends on." Legislative Commentary to OEC 901, reprinted in *Oregon Evidence* § 901.02 at 947. The official commentary to OEC 901 reflects that its drafters intended the "treatment of authentication and identification" to "draw[] largely upon common law and statutes to illustrate the general principle set forth in subsection (1) of this section." *Id*.

One of those common-law cases was *Miller*, which was specifically cited in the official commentary. *Id*. at 949. In *Miller*, the defendant made two tape-recorded statements, which were admitted after the detective who took the statements testified that they accurately related what was said. 6 Or App at 369. The defendant argued that the state failed to

lay a proper foundation for the audio recordings, relying on the "strict foundation requirements" set forth in *Evidence*, 29 Am Jur 2d 494, 495, § 436 (1967):

> "'* * * (1) a showing that the recording device was capable of taking testimony; (2) a showing that the operator of the device was competent; (3) establishment of the authenticity and correctness of the recording; (4) a showing that changes, additions, or deletions have not been made; (5) a showing of the manner of the preservation of the recording; (6) identification of the speakers; and (7) a showing that the testimony elicited was voluntarily made without any kind of inducement * * *.'"

*Miller*, 6 Or App at 369-70.

Before addressing the applicability of those factors, *Miller* turned to earlier Oregon cases and explained that once "'the accuracy of the recording device and the identity of the person speaking are fully established * * * the recording of an incriminating statement * * * is as much entitled to be received in evidence as a photograph of an object, a person or a place.'" *Id.* at 370 (quoting *State v. Reyes*, 209 Or 595, 636, 303 P2d 519, 304 P2d 446, 308 P2d 182 (1957)). *Miller* then held that "[i]t has long been established that a photograph is entitled to be received in evidence when a witness testifies that the photograph accurately depicts the object," and that "[w]e see no reason why the same rule should not be applied here." *Id.* (citing Supreme Court cases indicating that "common sense should be used in such matters").

*Miller* then went on to consider the detective's testimony under the seven-factor test described above, concluding that it was sufficient to send the question of the accuracy of the tapes to the jury:

> "The testimony of the detective that the tapes are accurate is sufficient evidence for fulfillment of the first five of the seven tests repeated from the quotation in 29 Am Jur 2d at 494, 495 *supra*. The sixth and seventh tests were satisfied by other testimony at the trial. Also, the jury had an opportunity to compare the defendant's voice when he was on the witness stand with the voice on the tapes.
>
> "Under the facts of this case it was up to the jury to determine whether the tapes were accurate. That is what

the court said in an identical situation in *Todisco v. United States*, 298 F2d 208, 211 (9th Cir 1961), *cert den*, 368 US 989, 82 S Ct 602, 7 L Ed 2d 527 (1962). *See also People v. Spencer*, 60 Cal 2d 64, 31 Cal Rptr 782, 383 P2d 134, 143, *cert den*, 377 US 1007 (1963), and *People v. Dupree*, 156 Cal App 2d 60, 319 P2d 39, 44 (1957), and *Annotation*, 58 ALR 2d 1024 (1958)."

6 Or App at 370-71.

As we recently explained in *State v. Noorzai*, 292 Or App 248, 253-54, 423 P3d 742 (2018), *opinion vac'd, appeal dismissed*, 293 Or App 432, 423 P3d 817 (2018),[1] *Miller* looked to the seven-factor test but actually was part of a line of cases representing a "more flexible" approach to authentication:

"Historically, a party seeking to establish the authenticity of an audio recording was required to make a litany of showings, including that the recording device was capable of taking testimony; that the operator of the device was competent; that no changes, additions, or deletions were made; and that the recording was preserved. *Miller*, 6 Or App at 369-70; *see also United States v. McKeever*, 169 F Supp 426, 430 (SD NY 1958), *rev'd on other grounds*, 271 F2d 669 (2d Cir 1959) (listing the same requirements). Although the traditional foundation also included the requirement that the proponent establish the 'authenticity and correctness of the recording,' *Miller*, 6 Or App at 370, Kirkpatrick has explained that a party fulfills that requirement by fulfilling the others. Kirkpatrick, *Oregon Evidence* § 901.04[2][d] at 955.

"More recently, many courts have moved away from a strict adherence to those requirements and approved a more flexible approach. *See, e.g.*, *Miller*, 6 Or App at 370-71, 487 P2d 1387 (concluding that testimony of detective who recorded the defendant's statements that recordings were 'accurate' satisfied five of the seven traditional factors); *United States v. Stephens*, 202 F Supp 2d 1361, 1367 (ND Ga 2002) (noting traditional requirements but clarifying that they are not a 'rigid formula for admission' in the Eleventh Circuit); *United States v. Green*, 175 F3d 822, 830

---

[1] We recognize that *Noorzai* was vacated after the defendant moved to dismiss his appeal, and it is not binding precedent. Nonetheless, its description of the evolution of our cases in this area remains helpful.

n 3 (10th Cir 1999) (recognizing that the *McKeever* factors may assist judges in ruling on foundation questions, but that they are not prerequisites for the admission of sound recordings)."

That more flexible approach to authentication is codified in OEC 901, in which the examples provided in subsection (2) "are not exclusive allowable methods but are meant to guide and suggest, leaving room for growth and development in this area of the law." Legislative Commentary to OEC 901, reprinted in *Oregon Evidence* § 901.02 at 947. That is, as we understand OEC 901, particularly in light of the official commentary to that rule, the requirements for authentication in Oregon will depend on the particular circumstances and the nature of the evidence that is offered.

In the case of digital recordings, the factors described in *Miller* are neither as rigid as defendant proposes, nor are they irrelevant, as the state treats them on appeal. The legislature was aware of, and intended to preserve, the principles described in *Miller*, and the factors listed in that case are apt considerations in determining whether a reasonable person would be satisfied that a digital recording is, in fact, what the proponent claims it to be. Whether the recording is digital or analog, its authenticity will depend on factors such as whether the device was capable of making a reliable recording; the operator was competent; the recording itself was authentic and correct; no changes, additions, or deletions had been made; the recording was preserved; when necessary, it is possible to identify speakers and actors in the recording; and, when offered to show purportedly voluntary statements, the recording depicts statements that were not made by inducement.

On the other hand, the showing necessary to satisfy those factors is not as demanding as defendant contends. OEC 901 does not require the proponent of evidence to persuade the trial court as to each of the requirements in *Miller*. Rather, it requires the proponent of evidence to establish a *prima facie* case of authenticity—"evidence *sufficient to support a finding* that the matter in question is what its proponent claims." OEC 901(1) (emphasis added). Where

a proponent has made that *prima facie* showing, the matter of authenticity is one for the ultimate factfinder at trial, not a preliminary ruling by the court. *See* OEC 104(2) ("When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition."); Legislative Commentary to OEC 901, reprinted in *Oregon Evidence* § 901.02 at 946 ("This requirement of showing authenticity or identity falls in the category of relevancy dependent upon fulfillment of a condition of fact and is governed by the procedure set forth in subsection (2) of section 5 (Rule 104) of this Act.").

Here, the state met that threshold to send the question of the authenticity of the recordings to the jury. *See State v. Divito*, 180 Or App 156, 164, 42 P3d 918, *rev den*, 334 Or 288 (2002) (explaining that "we review for legal sufficiency of the foundational evidence" when the question is authentication). Crediting Walker's testimony at the pretrial hearing, a factfinder could infer that Walker used a Sony camera to record the incident, and that the camera was capable of taking audio and video, and then capable of taking reliable audio with color bars after it was dropped; that Walker knew how to use the camera competently; that the recordings on the memory card, including the color bars on one of the videos, were the product of the recording process and not his own editing; that the recordings were, as Walker testified, "an accurate representation of what happened" on the day of the altercation, both "visually" and "audibly"; that the files on the memory card were preserved and not altered by Walker between the time of the recording and the time of trial; and that Walker could reliably identify the speakers in the videos, including the recording with color bars. A factfinder could further infer, from the circumstances of the recordings, that the statements on the recordings were not the product of inducement but were the voluntary statements of the speakers.

Contrary to defendant's view, his expert's testimony did not so seriously discredit the authenticity of the recordings that no factfinder could have confidence in them. The ease with which digital recordings can be manipulated or

edited is unquestionably a relevant consideration in determining the authenticity of a file, and metadata may play an important role. In *Lorraine v. Markel Am. Ins. Co.*, 241 FRD 534, 547-48 (D Md 2007), the court explained the role that metadata can play in authentication under the federal counterpart to Rule 901:

> "Another way in which electronic evidence may be authenticated under Rule 901(b)(4) is by examining the metadata for the evidence. Metadata,
>
> "'commonly described as "data about data," is defined as "information describing the history, tracking, or management of an electronic document." *** Some examples of metadata for electronic documents include: a file's name, a file's location (*e.g.*, directory structure or pathname), file format or file type, file size, file dates (*e.g.*, creation date, date of last data modification, date of last data access, and date of last metadata modification), and file permissions (*e.g.*, who can read the data, who can write to it, who can run it). Some metadata, such as file dates and sizes, can easily be seen by users; other metadata can be hidden or embedded and unavailable to computer users who are not technically adept.'
>
> "*** Because metadata shows the date, time and identity of the creator of an electronic record, as well as all changes made to it, metadata is a distinctive characteristic of all electronic evidence that can be used to authenticate it under Rule 901(b)(4). Although specific source code markers that constitute metadata can provide a useful method of authenticating electronically stored evidence, this method is not foolproof[.]"

For digital files, metadata is part and parcel of the evidence submitted, just as important as the visual image itself, or the text of the document.[2] In fact, there may be circumstances where an analysis of the metadata raises

---

[2] It is worth noting that the Federal Rules of Evidence changed in 2017 to include, among the list of self-authenticating documents, "[d]ata copied from an electronic device, storage medium, or file, if authenticated by a process of digital identification, as shown by a certification of a qualified person." FRE 902(14). The digital identification described by FRE 902(14) is typically a comparison of metadata hash values. To date, the Oregon legislature has not made a similar addition to the Oregon Evidence Code.

authenticity questions so significant that no reasonable person could believe the evidence to be authentic based solely on lay testimony from the file's creator. This is not such a case.

Although Primeau's analysis of the metadata identified certain irregularities, he expressly limited his conclusions to the metadata *of the duplicate he received*, not the original. At trial, he confined his analysis of the metadata to what he had received on the DVD copy and stated that he could not determine "whether or not the files that we saw today are authentic *without examining the camera and the original media*." (Emphasis added.) As the trial court recognized, the irregularities Primeau noted in the metadata of the DVD copy may have been the result of the process used to duplicate the files, not in the creation of the original files on the memory card. In any event, the evidence related to the metadata was far from definitive with regard to whether the original files had ever been altered. *Accord United States v. Safavian*, 435 F Supp 2d 36, 41 (DDC 2006) (concluding, under FRE 901, that "[t]he *possibility* of alteration does not and cannot be the basis for excluding e-mails as unidentified or unauthenticated as a matter of course, any more than it can be the rationale for excluding paper documents (and copies of those documents). *** Absent specific evidence showing alteration *** the Court will not exclude any *** e-mails because of the mere possibility that it can be done"). (Emphasis in original.)

Primeau's testimony about the presence of color bars likewise raised a matter for the jury to consider when determining whether to credit the recordings, not a basis on which to exclude the evidence for lack of authenticity. Although Primeau testified that color bars are a product of intentional editing in his experience, he also acknowledged that he was unfamiliar with the particular camera that Walker used and that he did not know whether it was possible for color bars to result from dropping that camera. In fact, he even appeared to hedge on his ultimate conclusion about the color bars, stating: "Well, *prior to today*, my opinion was that I believed that they were added to the recording, post recording[.]" (Emphasis added.)

In sum, we agree with the trial court that the state presented sufficient evidence to authenticate the recordings on Exhibit 1 under OEC 901, which requires only "evidence sufficient to support a finding that the matter in question is what its proponent claims." *See generally* Hon. Paul W. Grimm *et al*, *Authenticating Digital Evidence*, 69 Baylor L Rev 1, 11-12 (2017) (discussing the question of conditional relevance and explaining that, "[i]n evaluating all the factors below, it is important to remember that the threshold for the court's determination of authenticity under Rule 901 is not high: '[t]he [c]ourt need not find that the evidence is necessarily what the proponent claims, but only that there is sufficient evidence that the *jury* ultimately might do so.'" (Quoting *Safavian*, 435 F Supp 2d at 38; emphasis in *Safavian*.)). We therefore reject defendant's second assignment of error.

Affirmed.