202 December 31, 2025 No. 1140

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Appellant,*

*v.*

STACI LYNNE PARR TURNER,
aka Staci Lynne Parr, aka Stacey Lynne Turner, aka Staci
Lynne Turner,
*Defendant-Respondent.*

Multnomah County Circuit Court
22CR29976; A183628

Leslie G. Bottomly, Judge.

Argued and submitted October 2, 2025.

Ryan Kahn, Assistant Attorney General, argued the cause for appellant. Also on the briefs was Ellen F. Rosenblum, Attorney General, Dan Rayfield, Attorney General, and Benjamin Gutman, Solicitor General.

Carla E. Edmondson, Deputy Public Defender, argued the cause for respondent. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Oregon Public Defense Commission.

Before Shorr, Presiding Judge, Powers, Judge, and O'Connor, Judge.

POWERS, J.

Reversed and remanded.

**POWERS, J.**

In this criminal proceeding, the state seeks reversal of the trial court's pretrial order granting defendant's motion to exclude a surveillance video exhibit that the state intended to offer at trial. *See* ORS 138.045(1)(d) (granting the state authority to appeal from an order "made prior to trial suppressing evidence"). As explained below, we conclude that the trial court erred when it concluded that the state failed to make the required *prima facie* showing of authenticity under OEC 901. Accordingly, we reverse and remand.

To determine whether the state sufficiently authenticated its evidence under OEC 901, we review the foundational evidence for legal sufficiency. *State v. Sassarini*, 300 Or App 106, 127, 452 P3d 457 (2019). The procedural and factual background is undisputed. We set out only those facts necessary for our discussion of the sole assignment of error.

Portland Police Bureau Officer Green was investigating theft-related crimes that occurred in and around a fenced parking lot, which was located across the street from a United States Immigration and Customs Enforcement (ICE) facility. Green went to the ICE facility to see if the security cameras captured activity around the parking lot, which they did. Green reviewed a portion of the video on the ICE surveillance system with a federal officer—referred to as an "operator"—who was in uniform and wearing a federal police badge. The total timeframe of the events occurred over a nine-and-one-half-hour period, between the evening of June 6 and early June 7. The federal operator selected clips of the pertinent footage from within that time period and exported them onto a thumb drive, resulting in approximately three hours of footage. Green took the thumb drive from the federal operator and returned to his office and watched the entire video that had been placed on the thumb drive.

That video exhibit, which was the subject of the trial court's pretrial OEC 104 ruling, showed a woman driving a Nissan approach the area and park near the fence. A

man got out of the Nissan and entered the fenced-off area while the woman stayed in the driver's seat. The man came back out and appeared to pour fuel in the Nissan's gas tank, and eventually the woman drove the Nissan away. Later, the video showed a car ramming the fence of the parking lot.

The state charged defendant, the alleged driver of the Nissan, with first-degree criminal mischief, unlawful entry into a motor vehicle, and first-degree theft. Before trial, defendant moved to exclude the video exhibit, described above, which the state intended to offer into evidence. At the OEC 104 hearing, O'Neal, the commanding officer of the Portland office of the Department of Homeland Security and supervisor of the video-surveillance system for the Portland ICE offices, described how the video system worked.

The ICE cameras record continuously, and given limitations on storage capacity, the resulting video is saved on the system for a period of time, after which it is overwritten with new data unless the video is "flagged" to be preserved. An operator can generate and "export" video clips from the system by selecting which "camera views" and which "segments of time you want to be generated," which requires "just a few button clicks." O'Neal described the video system to be accurate and reliable, that the "date stamp" was similarly accurate and reliable, and that he was unaware of any "historical malfunctions or any problems that would call into question the date and timestamp." Additionally, the operator of the system has no way of manipulating the date stamp, and there is no editing program that would allow the operator to edit the video in other ways. Although O'Neal had not checked the logs to see who had operated the system to export the video, only trained federal officers operate the system and access is limited to authorized users, and the video itself showed that the person "followed the procedure to export the video."

Farley, the owner of the lot, reviewed a portion of the video and noted that the damage to the gate that appeared on the video conformed to the actual damage that was done to his lot.

At the OEC 104 hearing, the parties did not dispute the underlying facts; rather, the dispute was a legal

one—*viz.*, whether, based on the undisputed facts, the state made the required *prima facie* showing of authenticity under OEC 901 for admission of the video exhibit. Ultimately, the trial court granted defendant's motion to exclude the exhibit. In making its OEC 901 determination, the court did not make explicit findings of fact—other than specifically finding that one witness was credible—and relied on the factors discussed in *Sassarini*.[1]

The state timely appealed, continuing its assertion that the state's evidence was sufficient to support a juror's finding that the surveillance video was what it purports to be—recordings taken from ICE's surveillance system.

Under OEC 901, legally sufficient authentication "requires only 'evidence sufficient to support a finding that the matter in question is what its proponent claims.'" *Sassarini*, 300 Or App at 130 (quoting OEC 901(1)). That threshold "is not high," and, for the state's evidentiary foundation to be deemed sufficient, we need not conclude that "the evidence is necessarily what the proponent claims." *State v. H. D. E.*, 304 Or App 375, 384, 467 P3d 771, *rev den*, 367 Or 220 (2020) (internal quotation marks omitted). Rather, as we explained in *Sassarini*, the analysis is a "flexible" approach, requiring the proponent of the evidence to make a "*prima facie* showing" of authenticity before the question of whether the evidence is what it purports to be can go to the ultimate finder of fact. 300 Or App at 125-27.

In applying that flexible approach, and in assessing whether evidence has been sufficiently authenticated, courts may consider whether: (1) the recording device was "capable of taking testimony"; (2) the operator of the device was competent; (3) the recording is accurate; (4) the recording has not been changed, added to, or deleted from; (5) the recording was adequately preserved; (6) the actors or speakers can be identified; and (7) the testimony elicited was voluntarily made without any kind of inducement.[2] *Id.* at 124, 126 (citing *State v. Miller*, 6 Or App 366, 369-70, 487 P2d

---

[1] The prosecutor asked the trial court to make explicit findings of fact, but the court declined to do so.

[2] The parties agree that factor seven is not applicable to this case, because the video does not contain testimony.

1387 (1971)). Importantly, however, the requirements for authentication will depend on the particular circumstances and the nature of the evidence that is offered. *Id.* at 126.

With that legal framework in mind, we turn to the challenged exhibit. Here, a factfinder could infer from the evidence adduced at the OEC 104 hearing that the video-surveillance system was capable of taking a video; that a trained, federal officer knew how to use the system competently; that an ICE officer exported recordings onto a thumb drive and that the recordings on the thumb drive were the product of the recording process; and that the files on the thumb drive were not altered. On the last point, although it is true that the exported files represented only specified timeframes and camera angles, there is no evidence that the files themselves were altered. Accordingly, although arguments could be made to challenge the veracity of what is depicted in the exhibit, there is sufficient evidence for a factfinder to determine whether to credit the video.

In urging us to affirm the trial court's ruling, defendant contends that the state failed to carry its burden, highlighting that the state had not offered a witness who had personally observed the events to verify the video's accuracy, that the identity of the ICE operator who exported the clips was unknown, that neither O'Neal nor Farley had viewed the entirety of the footage, and that the state presented no evidence as to the sixth factor—the identity of the actors in the video. Contrary to defendant's contention, those arguments do not so seriously discredit the authenticity of the recordings such that no factfinder could have confidence in them.

As noted above, Green viewed some of the video footage at the ICE facility, an ICE officer (in uniform and with a federal badge) exported the video and gave it to Green, who went back to his office and viewed the video in its entirety. Additionally, as described by O'Neal, there was no "video-editing" system and when clips are pulled out from the system and from different cameras, there might not be a continuous recording. That testimony was sufficient to allow a factfinder to infer that the video was not altered and that it was properly preserved. Additionally, the undisputed evidence

adduced at the hearing was that only trained federal officers operated the system and there was no evidence that the system was not operating as intended. Although Farley had not viewed all of the footage, he had seen the portion that the state played during his direct examination, and he confirmed that the video showed a vehicle ramming the gate, matching the damage he discovered the following day, which could support a finding by the jury that the video was accurate. Moreover, in this case, the identity of the actors in the video is ultimately a question for the factfinder.

Taken together, the state presented sufficient evidence to make the required *prima facie* showing of authenticity under OEC 901. Our conclusion that it meets the standard for admission under OEC 901 should not be read as a comment on any of the arguments as to whether the video was sufficiently persuasive to establish, as fact, that defendant was involved in the thefts. Properly understood, that is a decision for the factfinder; our decision simply reverses the trial court's evidentiary ruling and remands the case for further proceedings.

Reversed and remanded.