Argued and submitted March 4, reversed and remanded May 5, 2021

# STATE OF OREGON,
*Plaintiff-Appellant,*

*v.*

# ADRIAN ALEXANDER ACOSTA,
*Defendant-Respondent.*

Douglas County Circuit Court
18CR44726; A169268

489 P3d 608

The state appeals after the trial court's pretrial exclusion of Facebook messages that were purportedly exchanged between defendant and a police detective setting up a methamphetamine delivery. The trial court ruled that the messages were inadmissible on two distinct grounds: (1) the state failed to authenticate the messages, and (2) they were hearsay in light of the state's inadequate showing that defendant was the declarant of those out-of-court statements. On appeal, the parties present opposing views as to whether identity of the declarant of a social media post, for purposes of determining whether it is an admission of a party opponent, is a gatekeeping question for the trial court to resolve or instead an issue of conditional relevancy to be decided by the jury so long as the proponent of the evidence makes out a *prima facie* case of authorship; the parties also disagree, under their competing standards, as to whether the state made a sufficient showing to establish that defendant was the author of the messages. *Held*: The question of identity of the declarant of an out-of-court statement presents a question of conditional relevance that is evaluated under the same standard for identity as a condition precedent to admissibility set forth in OEC 901. If, over a hearsay objection, the proponent of the evidence presents a *prima facie* case that the party opponent is the declarant, the trial court must conditionally admit the evidence and instruct the jury to consider the evidence only if it determines that the party opponent was, in fact, the declarant. Where the statement in question is a social media post, and the proponent of that evidence claims that the message originated from a particular account and was authored by a particular person, the proponent must present evidence such that a reasonable person would be satisfied as to authorship. One possible means of satisfying that standard, accounting for the ease and frequency of manipulation of social media and other digital messaging, is through the appearance, contents, substance, internal patterns or other distinctive characteristics of the postings, taken in conjunction with the surrounding circumstances. Under that standard, the trial court erred in excluding the Facebook messages. The content of the messages and the surrounding circumstances in combination were sufficient for a reasonable person to be satisfied that defendant authored them in response to messages from the detective.

Reversed and remanded.

Ann Marie Simmons, Judge.

Christopher Page, Assistant Attorney General, argued the cause for appellant. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Nora Coon, Deputy Public Defender, argued the cause for respondent. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Before Lagesen, Presiding Judge, and James, Judge, and Kamins, Judge.

JAMES, J.

Reversed and remanded.

**JAMES, J.**

This case calls upon us to once again consider issues of authentication of digital evidence, as we recently did in *State v. Sassarini*, 300 Or App 106, 452 P3d 457 (2019). The state challenges the trial court's exclusion of Facebook messages that were purportedly exchanged between defendant and a police detective setting up a methamphetamine delivery. The trial court ruled that the messages were inadmissible on two distinct grounds: (1) the state failed to authenticate the messages, and (2) they were hearsay in light of the state's inadequate showing that defendant was the declarant of those out-of-court statements, for purposes of an admission of a party opponent. This case therefore presents an additional question of digital evidence than contained in *Sassarini*: whether the identity of the declarant of a social media post, for purposes of an admission of a party opponent, is a gatekeeping question for the trial court, or is an issue of conditional relevancy to be decided by the jury. We conclude it is the latter, and, as we explain, resolving that issue of identity is accomplished through special jury instructions and, at times, a special verdict form, or an interrogatory verdict form. Here, we agree with the state that it produced sufficient evidence to support a finding that the Facebook account was defendant's and that he was the author of the messages, and we therefore reverse the ruling excluding them.

## I.   BACKGROUND

We begin with a summary of the context for the court's evidentiary rulings. Defendant was arrested in the parking lot of the Southgate Market and charged with unlawful delivery of methamphetamine, ORS 475.890, and unlawful possession of methamphetamine, ORS 475.894. To prove its case, the state planned to offer screen captures from a detective's cell phone showing that he had arranged a drug deal at that location with a Facebook profile with defendant's name and picture (the "Acosta profile").

Defendant moved pretrial to exclude evidence of the messages, arguing that the state could not establish that the Acosta profile was in fact his account or that he authored messages sent from that account. Consequently, defendant

argued, the state had two problems. First, it could not authenticate the messages. *See* OEC 901 ("The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."). And, second, if the state could not establish that defendant authored the messages, their content was inadmissible hearsay. *See* OEC 802 (providing that "[h]earsay is not admissible except as provided in ORS 40.450 to 40.475 or as otherwise provided by law"); OEC 801(4)(b)(A) (A "party's own [out-of-court] statement" that "is offered against a party" is not hearsay.).

In response, the state argued that it could present evidence "to show that they are the defendant, defendant's account, as opposed to just some, some random person." To make that foundational showing, the state called Detective Wells, the narcotics detective for the Oregon State Police who arrested defendant. Wells testified that, as part of his undercover operations, he maintained a fictitious Facebook profile to communicate with persons involved in drug offenses. That fictitious profile was Facebook friends with people from all over the world, most of whom Wells did not even know. One of those friends was a profile named Adrian Acosta.

Wells explained that, on June 21, 2018, he observed a post "on my news feed or Facebook feed from the profile of Adrian Acosta that said 'I'm working. Got rocket fuel. Anyone looking?'" Based on his training as a narcotics detective, Wells understood that post to mean that the person was holding and looking to sell drugs, likely a stimulant like methamphetamine.

Wells testified that, a week later, on June 28, he used the Facebook Messenger app on his cell phone to initiate conversation with the Acosta profile, followed by a screenshot of the rocket fuel post and a message that read, "Just so happens i lookin." Wells and the Acosta profile then communicated through Facebook Messenger over the course of days about price and quantity (*e.g.*, "Okay homie can u do a zip" (meaning an ounce), and "Yeah I can its gonna be 520.is that alright homie"); those messages, which the

state intended to offer at trial, were introduced as Exhibits 1 through 30 at the pretrial hearing.

In reference to those messages, Wells testified that there were several opportunities where the "profile of Mr. Acosta said that they were able to meet me but I wasn't able to due to other operations or being on days off or whatever." Wells explained that he made numerous excuses for why he could not meet until July 3, and he avoided all attempts by the Acosta profile to contact him by phone (the screen captures reflect 33 missed calls from the Acosta profile between June 28 and July 3).

The screen captures for Monday, July 2, show a message from Wells asking, "You got it now?? I can come to u." The Acosta profile responds, "520 and I am in Winston," and later, "Call my number g," followed by a 10-digit number with a 541 area code. Those messages are then followed by messages from Wells stating, "I tried callin ur number and text…u get it?" and "Sorry g lets just meet up where?" Later, Wells asks, "Hey bro any word," and the Acosta profile responds, "Yeah here at Sonia house in Winston come through g."

Wells testified that, based on "the profile telling me he was at Sonya's in Winston, * * * we set up surveillance on Sonya's in Winston"—a residence that had had several drug complaints over the past year. He further testified that, on July 3, he saw defendant come out of that residence.

The screen captures for messages dated July 3 show Wells asking the Acosta profile to bring the drugs to him at the "Southgate market." The Acosta profile agrees and states, "I will let you know when I am close and I will be in a lifted truck." Wells testified that, on the previous day, he had seen defendant in a "higher truck, of standard height or slighter lifted, a gray F250."

The screen captures reflect that the Acosta profile and Wells exchanged a series of messages about when the Acosta profile would leave the Sonya residence. One message from the Acosta profile states, "K ill let you know when my ride get here k," and that it would be "15 25 minutes at the latest would be 45 minutes k." After another inquiry

from the Wells profile, the Acosta profiles states, "I'm on my way in ten minutes k g."

Wells testified that he received the "I'm on my way in ten minutes" message at 6:36 p.m., and that a gray pickup arrived at 6:44 p.m. at Sonya's residence. The pickup was a "lowered pickup." Wells saw defendant come out of the Sonya residence, put a backpack in the back of the truck, and get into the right front seat of the truck. The pickup backed out of the driveway and headed towards Main Street in Winston. Wells testified that, as the truck was leaving the Sonya residence, he received a message from the Acosta profile stating, "Let u know when I'm there g k."

Wells and another detective followed the pickup and, as they neared Kelly Corner at Highway 42 and Roberts Creek Road, Wells received a message from the Acosta profile stating, "Be at the spot in 10 homie." Wells testified that they were about 10 minutes from Southgate at that point, so 10 minutes "was pretty consistent with where we were at." The final message Wells received from the Acosta profile was at 6:54 p.m., and it said "Here." Wells testified that, "at that point, we were within a minute of arriving at the Southgate Market."

Wells testified that he and the other detective pulled in behind the gray truck in the Southgate Market parking lot and ordered the three occupants out of the vehicle. The truck had a standard cab and three seats: Defendant was in the right front seat, Tuell was in the middle seat, and Evans was in the driver's seat. Wells testified that he advised defendant of his rights, told him that he had "set him up," recounted some of their conversation, and asked where the drugs were. Defendant eventually stated, "in essence, that he had talked about helping [a friend] out with facilitating it but he, he didn't want to because he had been clean. It, it was something to that effect." During the arrest, police seized a cell phone that was sitting on top of Tuell's purse, which Wells testified was "underneath their legs on the right side of the truck," within reach of where defendant was sitting. Wells testified that defendant had told him that "he had a cell phone in the truck," and that Tuell "acknowledged that it was [defendant's] cell phone."

During the course of his testimony, particularly during cross-examination, Wells acknowledged the limits of his investigation. He "never physically saw [defendant] text, texting or messaging off of a phone or anything other kind of electronic device." Police never attempted to get information from Facebook about who set up the profile or when it was set up, and Wells had relied on the appearance of the Facebook account—the name and photographs. And, police never searched the phone found in the truck.

Wells was the only witness at the pretrial hearing, and the court then heard arguments on defendant's motion. Defendant reiterated his argument that nothing in the record sufficiently established that the account was actually defendant's rather than a fictitious profile, considering the ease with which fake accounts—like the detective's—can be created. Defendant, focusing on the limitations of the investigation, argued that Wells never saw defendant texting, never spoke to the Acosta profile on the phone to identify his voice, never searched the cell phone in the truck, and never obtained any information from Facebook that tied defendant to the account or the messages. Moreover, he argued, there were other people in the truck (which was not even the "lifted truck" police had associated with defendant), and that it could have been anyone else involved, such as Tuell, who sent the messages from the cell phone.

The state responded that, given all of the corroborating circumstances between the messages and the transactions, there was sufficient evidence for a jury to reasonably conclude that the Acosta profile was not a fictitious account but actually defendant's, and that he was the author of the messages. The state argued that defendant could make his case to the jury that anyone can create a fake profile, but that it was a matter for the jury to weigh and not a question of admissibility.

The trial court expressed its concern with "the fact that, apparently, we are all supposed to believe that these messages came from [defendant's] phone and yet, we haven't really established that he was ever in control of the phone or that he was using it?" After a recess, the court ruled in defendant's favor, explaining:

"[I]f you're going to offer statements as if they were made by the Defendant and they are offered against the Defendant as incriminating statements, you have to establish that the Defendant is the declarant. That isn't established in this case. There is certainly circumstantial evidence of that. But the Defendant actually has to be the declarant and I can't make the finding that the defendant is the declarant in this case.

"* * * * *

"Here, what I have is an officer, using a fictitious Facebook account, contacting somebody and asserting that it absolutely must be that person on the other side. Do I think that [defendant] sent those messages? Yeah. I do. Is it legally established that [defendant] sent those messages? No. It's not legally established."

The court therefore granted the motion to exclude the evidence, which the state now appeals. *See* ORS 138.045(1)(d) (authorizing a state's appeal from "[a]n order made prior to trial suppressing evidence").[1]

## II.   ANALYSIS

On appeal, the parties not only present different views on the merits of the authentication and hearsay issues, they present competing formulations as to the trial court's role in deciding those questions. The state argues that the fundamental question underlying the authentication and hearsay analysis is whether defendant made the statements at issue, which is a preliminary fact that the court determines under the conditional relevance standard—essentially, whether there is evidence from which a jury could conclude that defendant made the statements. Viewed through that lens, the state argues that its "proof of the identifying marks on the messages tying them to defendant, the

---

[1] Defendant moved to dismiss the state's appeal on the ground that ORS 138.045(1) only authorizes an appeal from the denial of a motion to suppress evidence based on a *constitutional* violation. The appellate commissioner rejected that contention based on existing precedent and also denied defendant's alternative request to stay the appeal pending resolution of a similar challenge in the Supreme Court in *State v. Jackson* (S067622), and the Court of Appeals denied reconsideration of the order. Defendant has petitioned for Supreme Court review of those orders, and that petition is currently being held in the Supreme Court for *Jackson*.

content of the messages conveying defendant's particularized knowledge of private information, and the external circumstances of the transmission of the messages permitted a rational jury to reasonably infer that defendant authored the messages."

Defendant, on the other hand, argues that his authentication and hearsay arguments involve wholly distinct predicate determinations by the trial court, each under a different standard. Defendant agrees with the state that the authentication question involves a conditional relevancy analysis, but he argues that the hearsay question is committed to the trial court as gatekeeper under the standard in OEC 104(1), which means that the trial court makes its own factual determination as to whether the state proved by a preponderance of the evidence that defendant was the declarant. On the merits, defendant argues that the state failed to offer sufficient evidence to authenticate the messages under the conditional relevance standard in OEC 901 or to establish by a preponderance of the evidence that defendant was the declarant for purposes of the hearsay analysis under OEC 801.

A.  *Preliminary Factfinding for Authentication and Hearsay: The "Overlap" Problem*

We begin with the parties' competing contentions about the nature of a trial court's predicate determinations regarding authentication and hearsay. Because our discussion touches on three interrelated evidentiary rules—OEC 104 (preliminary questions of fact); OEC 901 (authentication and identity); and OEC 801 (hearsay)—we begin with an overview of those rules.

1.  *Applicable rules*

a.   OEC 104

OEC 104 provides the general framework for a trial court's handling of preliminary questions of fact related to the admissibility of evidence. It provides, in relevant part:

"(1)   Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege or the admissibility of evidence shall be determined

by the court, subject to the provisions of subsection (2) of this section. In making its determination the court is not bound by the rules of evidence except those with respect to privileges.

"(2)   When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition."

The Legislative Commentary to Rule 104 explains that subsection (1) "has general application, but must be read as subject to" subsection (2) of the rule. Legislative Commentary to OEC 104, *reprinted in* Laird C. Kirkpatrick, *Oregon Evidence* § 104.02 (7th ed 2020).[2] In other words, preliminary questions of fact are decided by the trial court under OEC 104(1) unless the question falls within OEC 104(2), in which case the trial court simply assesses whether the evidence is sufficient for a jury to make the necessary finding. As this case demonstrates, the line between the two types of preliminary facts, and their categorization under subsection (1) versus (2), is not always self-evident.[3]

b.   Authentication and identity

OEC 901 addresses a subset of the "conditional relevance" questions described by OEC 104(2): questions of authentication and identification. OEC 901(1) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."

OEC 901(2) provides "examples of authentication or identification conforming with the requirements of subsection (1)." Those examples, which are by way of illustration

---

[2] The legislative commentary to the Oregon Evidence Code is considered part of the Code's legislative history. *State v. Phillips*, 367 Or 594, 607 n 9, 482 P3d 52 (2021).

[3] The view of "conditional relevancy" underlying OEC 104 is not without its critics. *See, e.g.*, Ronald J. Allen, *The Myth of Conditional Relevancy*, 25 Loy LA L Rev 871, 877 (1992) ("[I]f determining the relevance of evidence always requires relying on some intermediate premise, no distinction can be drawn between relevancy and conditional relevancy. The truth of this proof is confirmed by demonstrating that the Advisory Committee's example of a relevancy problem cannot be distinguished from its examples of conditional relevancy.").

and not limitation, include "[n]onexpert opinion as to the genuineness of handwriting, based upon familiarity not acquired for purposes of the litigation"; the "identification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker"; and "[t]elephone conversations" under certain conditions.[4]

The commentary to OEC 901 explains that the rule reflects the view that "[a]uthentication and identification represent a special aspect of relevancy." Legislative Commentary to OEC 901, *reprinted in* Kirkpatrick, *Oregon Evidence* § 901.02 (citing Jerome Michael and Mortimer J. Adler, *Real Proof*, 5 Vand L Rev 344, 362 (1952); *McCormick on Evidence*, §§ 212 and 218 (2d ed 1972); and Edmund M. Morgan, *Basic Problems of Evidence* 378 (1962)). For instance, "[a] telephone conversation may be irrelevant as having an unrelated topic, or because the speaker is not identified. The latter aspect is the one here involved." Legislative Commentary to OEC 901, *reprinted in* Kirkpatrick, *Oregon Evidence* § 901.02. The commentary states that, under OEC 901, "[t]his requirement of showing *authenticity or identity* falls in the category of relevancy dependent upon fulfillment of a condition of fact and is governed by the procedure set forth in subsection (2) of section 5 (Rule 104) of this Act." *Id*. (emphasis added).

For that reason, as we recently held in *Sassarini*, 300 Or App at 126, OEC 901 does not require the proponent of evidence to persuade the trial court as to each of the requirements for authentication; rather, as a matter of conditional relevancy, "it requires the proponent of evidence to establish a *prima facie* case of authenticity—'evidence *sufficient to support a finding* that the matter in question is what its proponent claims.'" *Id*. (quoting OEC 901(1); emphasis in *Sassarini*). So long as the proponent of the evidence has made that *prima facie* showing, "the matter of authenticity is one for the ultimate factfinder at trial, not a preliminary ruling by the court." *Id*. at 127.

---

[4] The full text of the rule is set out later, in our discussion of the state's arguments on the merits. 311 Or at 162-64.

   c.  Hearsay

OEC 802 supplies the general rule against the admission of hearsay, and OEC 801 describes what is and is not hearsay. OEC 801(3) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." OEC 801(4) then sets forth a list of what is *not* hearsay:

"A statement is not hearsay if:

"(a)   The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement:

"(A)   Is inconsistent with the testimony of the witness and was given under oath subject to the penalty of perjury at a trial, hearing or other proceeding, or in a deposition;

"(B)   Is consistent with the testimony of the witness and is offered to rebut an inconsistent statement or an express or implied charge against the witness of recent fabrication or improper influence or motive;

"(C)   Is one of identification of a person made after perceiving the person; or

"(D)   Purports to interpret an otherwise admissible statement made by another person from one language into another.

"(b)   The statement is offered against a party and is:

"(A)   That party's own statement, in either an individual or a representative capacity;

"(B)   A statement of which the party has manifested the party's adoption or belief in its truth;

"(C)   A statement by a person authorized by the party to make a statement concerning the subject;

"(D)   A statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship; or

"(E)   A statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

"(c)   The statement is made in a deposition taken in the same proceeding pursuant to ORCP 39 I."

Unlike OEC 901, OEC 801 does not explicitly address whether factual preconditions underlying hearsay determinations are the type of predicate fact decided under OEC 104(1) or matters of conditional relevance under OEC 104(2). It therefore falls to the courts to sort out that question.

In *State v. Carlson*, 311 Or 201, 808 P2d 1002 (1991), the Supreme Court sorted out that question for one of the issues underlying the hearsay definition in OEC 801(4)—the exemption for a "statement of which the party has manifested the party's adoption or belief in its truth" under subparagraph (b)(B). The court noted that few courts had addressed the question, and that "[c]ourts, scholars and commentators who have spoken on the issue disagree on the answer." *Id.* at 210. The court then proceeded to examine the text of OEC 104(1) and the commentary to that rule, as well as the basic division in OEC 104 between "competence" and "relevance," to determine how to categorize "the question of intent to adopt, agree or approve." *Id.* at 212. The court also considered whether the policies underlying the hearsay rule would be frustrated if the question of "intent to adopt, agree or approve" were treated as one of conditional relevancy rather than one of admissibility for the trial court. *Id.* at 212-13.

Ultimately, the court held that "whether the party intended to adopt, agree with or approve of the contents of the statement of another, a precondition to the admissibility of evidence offered under OEC 801(4)(b)(B), is a preliminary question of fact for the trial judge under OEC 104(1)," not a question of conditional relevance. *Id*. at 211. The court also reached the same conclusion with regard to the excited utterance exception, albeit without extended discussion. *Id.* at 216 ("As is true of statements of a party opponent, the admissibility of a hearsay statement under the excited utterance exception is to be resolved by the trial judge.").

Since *Carlson*, Oregon courts have taken similar approaches to other preliminary determinations related to hearsay. In *State v. Cornell*, 314 Or 673, 677, 842 P2d 394

(1992), the court explained that OEC 801(4)(b)(E) requires the party seeking to introduce a statement by a co-conspirator to establish three foundational requirements—(1) that there was a conspiracy in which both the accused and the declarant were members; (2) that the declarant made his or her statement "during the course" of the conspiracy; and (3) that the statement was made "in furtherance of the conspiracy." The court held that "[w]hether the foundational requirements are met is a preliminary question of fact to be determined by the trial court under OEC 104(1), and each requirement is to be established by a preponderance of the evidence." *Id.* (citing *Carlson*, 311 Or at 209; footnote omitted). *See also State v. Iseli*, 366 Or 151, 162, 458 P3d 653 (2020) ("OEC 804(1) requires a trial court to evaluate facts proffered under the specified criteria to determine whether they are satisfied. Thus, the rule appears to contemplate a standard that either is satisfied or is not; it does not suggest a range of legally permissible choices."); *State v. Cunningham*, 337 Or 528, 538, 99 P3d 271 (2004) ("The trial court finds the facts that underlie the application of OEC 803(2), and those findings will not be disturbed if evidence in the record supports them.").

To date, however, Oregon courts have not engaged expressly in a *Carlson*-type analysis to determine whether the identity of the declarant under OEC 801(4)(b)(A) presents a preliminary question that is decided by the trial court under OEC 104(1) or is a question of conditional relevancy evaluated under OEC 104(2). *See State v. Navaie*, 274 Or App 739, 748-49, 362 P3d 710 (2015), *rev den*, 360 Or 236 (2016) (explaining that "[t]here is no Oregon case on this precise question" and assuming, without deciding, that OEC 104(1) applied based on how the issue had been litigated in the trial court and on appeal).

The answer to that question is significant in this case, because the issues of authentication and hearsay depend on a similar underlying question: Who authored the statement that is being offered into evidence? If the question of identity under OEC 801(4)(b)(A) is treated the same way that courts have treated other predicate hearsay determinations—that is, as a preliminary fact for the trial court to decide—the matter presents a complicated problem,

because the same predicate factual question is governed by different factfinders reviewing different evidence. For purposes of OEC 801, it is committed to the trial court, which is not bound by the rules of evidence except those with respect to privileges; but for purposes of OEC 901, it is committed to the jury upon or subject to the introduction of evidence sufficient to support a finding on the issue. *See* Kenneth W. Graham, Jr., 21 A *Federal Practice & Procedure* (Wright & Miller) § 5053.5 (2d ed Apr 2020 Update) (describing circumstances in which the court and jury will be presented with the same predicate factual determination, including under FRE 104(a) and (b), the federal counterparts to OEC 104(1) and (2)); *id.* § 5055 ("[W]hat should the court do when inadmissible evidence could be used for a 104(a) issue that overlaps with a 104(b) issue; *e.g.*, where the question of who wrote a letter must be answered both in authenticating the letter and determining whether or not it is a straight admission for purposes of the hearsay rule[?]").

Alternatively, if the question of identity under OEC 801(4)(b)(A) is treated as one of conditional relevance, matters are more straightforward—at least, initially: The trial court applies the same standard, and looks at the same evidence, to evaluate identity under OEC 901 and OEC 801(4)(b)(A), which is whether the proponent has made out a *prima facie* case on that particular issue. But if the proponent satisfies that standard, the hearsay ruling becomes conditional, such that the jury will need to be instructed on what to do if it finds that the party opponent was *not* the declarant.

2.   *Preliminary determination under OEC 801(4)(b)(A)*

The critical question, then, is whether the identity of the declarant under OEC 801(4)(b)(A) involves the type of determination that is a factual determination for the trial court under OEC 104(1) or a question of conditional relevance under the standard articulated in OEC 901 and OEC 104(2). Although we have never analyzed that question at length, *see Navaie*, 274 Or App at 748, we are not writing on a clean slate either.

In *State v. Park*, 140 Or App 507, 511, 916 P2d 334, *rev den*, 323 Or 690 (1996), we addressed arguments

materially indistinguishable from the ones made in this case. The defendant objected to the admission of a letter on hearsay grounds, arguing that the state failed to demonstrate a sufficient foundation for admissibility under OEC 801(4)(b)(A) as a statement of a party opponent. We concluded that the question of authorship was one of conditional relevance in light of the commentary to OEC 104(2), which supplies this example: "If a letter purporting to be from Y is relied upon to establish an admission by Y, it has no probative value unless Y wrote or authorized it." *Park*, 140 Or App at 512 (quoting Legislative Commentary to OEC 104; emphasis omitted). We stated, "Whether the letter was written by defendant is not a preliminary question of fact under OEC 104(1), contrary to the state's suggestion," followed by this footnote:

> "Both parties rely on *State v. Carlson*, 311 Or 201, 210, 808 P2d 1002 (1991), in their dispute over whether OEC 104(1) or 104(2) controls our standard of review. *Carlson* is inapposite; it involves admissions adopted by a party under OEC 801(4)([b])(B), and whether the party intends to adopt, agree or approve a statement of another. In contrast, the issue in this case presents a question of conditional relevancy."

*Id.* at 511 n 2.

Needless to say, the parties in this case have divergent views on the significance of *Park*. The state cites it as controlling authority; defendant ignores it, asserting that "this question is straightforward. Both *Carlson* and *Cornell* interpreted OEC 104(1) as governing hearsay determinations and applied that standard to two other subsections of OEC 801(4)(b)," so "this court should treat the question of identity of a declarant for purposes of OEC 801(4)(b)(A) as a preliminary question of fact for the trial court to determine."

We acknowledge that *Park* did not provide a lengthy analysis of the intersection between hearsay and authentication questions, and its statement that *Carlson* was "inapposite" appears in a footnote.[5] That said, the court in *Park* was presented with the precise question before us—whether,

---

[5] *See* Wright & Miller at § 5055 n 163 (citing *Park* as an example of a case that dealt with the overlap problem "by ignoring it").

for purposes of a hearsay objection under OEC 801(4)(b)(A), the identity of the declarant is a question of conditional relevance under the Oregon Evidence Code or a preliminary question of fact for the trial court—and it reached a decision on that point after considering the text and commentary of the Oregon Evidence Code and determining that the holding in *Carlson*, which did not involve the question of identity, was distinguishable. We therefore will adhere to that considered holding unless it is plainly wrong. *See State v. Civil*, 283 Or App 395, 405-07, 388 P3d 1185 (2017) (providing the standard for overruling our own precedent).

Defendant does not expressly ask us to overrule *Park* (in fact, he does not even discuss it), but, considering his reliance on *Carlson* and our suggestion in *Navaie*, 274 Or App at 749, that the issue may yet be an open one, we take it upon ourselves to consider whether we were plainly wrong in *Park*.

In determining the applicable OEC 104 standard in *Carlson*, the court looked to the text, context, and history of the Evidence Code and whether they indicated how the drafters intended to characterize the particular issue. *See id.* at 210-11. The text of OEC 104(1) provides that "[p]reliminary questions concerning *** the admissibility of evidence shall be determined by the court, subject to the provisions of subsection (2) of this section." And the Legislative Commentary to OEC 104 gives examples of preliminary questions that are decided by the court under OEC 104(1)—whether a witness whose former testimony is offered under OEC 804(3)(a) is unavailable, as that term is defined in OEC 804(1) and (2), and whether a hearsay statement offered under OEC 804 (3)(c) is against the declarant's interest. *Id*. As *Carlson* pointed out, the reference to "admissibility of testimony" and the examples in the commentary both suggest that the admissibility of hearsay, and factual questions preliminary to the admission of hearsay, are to be decided by the court.

But with the particular question of *identity* of the declarant, there are textual, contextual, and legislative commentary clues that point in a different direction. The most significant is the existence of OEC 901, which was the focus in *Park*. That rule and its context explicitly

refer to questions of "identity" as a "condition precedent to admissibility"—without restriction or clarification as to which rules of admissibility. OEC 901 ("The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."). By its plain text, the standard in OEC 901 appears to apply to the question of identity to the extent that it is a condition precedent to the admission of testimony under OEC 801(4)(b)(A).

As the commentary to OEC 901 explains, that rule is an elaboration on the application of OEC 104(1). It is not entirely clear whether the drafters of those rules perceived a difference between a purely factual question of identity—who was the declarant?—and any substantive hearsay determinations that might arise beyond that factual question. For instance, the commentary states, "A telephone conversation may be irrelevant as having an unrelated topic, or because the speaker is not identified. The latter aspect is the one here involved." The commentary goes on to state that "[c]ompliance with requirements of authentication or identification by no means assures admission of an item into evidence, *as other bars such as hearsay may remain*." Legislative Commentary to OEC 901, *reprinted in* Kirkpatrick, *Oregon Evidence* § 901.02 (emphasis added).

Another section of the commentary to OEC 901, which addresses authentication of what had been known as "ancient documents," explicitly references the potential overlap between authentication and hearsay questions:

"Despite the utility of paragraph (h) of subsection (2) of this section, it is merely a rule of authentication, and its satisfaction does not necessarily guarantee the admission of the writing authenticated. Thus, a writing may be properly authenticated under any of the methods suggested and yet be inadmissible as hearsay or secondary evidence. A partial overlap exists between the requirements of this section and a doctrine that recitals in certain types of ancient instruments may be received as evidence of the facts recited. *The latter doctrine, however, constitutes an exception to the rule against hearsay and is quite distinct*

*from the principles of this section concerning authentication.*
McCormick, *Evidence*, section 223 at p 550 (2d ed 1972)."

Legislative Commentary to OEC 901, *reprinted in* Kirkpatrick,
*Oregon Evidence* § 901.02 (emphasis added).

It is possible that the drafters were drawing a dis-
tinction between the "conditional relevance" question of iden-
tity or authorship and *other* preliminary hearsay matters.
The Legislative Commentary to OEC 104 is equally vague
on that point. One of the examples of conditional relevance
under that rule, which we quoted in *Park*, speaks directly
to how the drafters understood the question of authorship:
"If a letter purporting to be from Y is relied upon *to estab-
lish an admission by Y, it has no probative value unless Y
wrote or authorized it.*" Legislative Commentary to OEC 104,
*reprinted in* Kirkpatrick, *Oregon Evidence* § 104.02 (empha-
sis added).

The commentary to OEC 104 explains the justifica-
tion for treating that type of question as one for the jury:

"If preliminary questions of conditional relevancy were
determined solely by the judge, as provided in subsection
(1), the functioning of the jury as a trier of fact would be
greatly restricted and in some cases virtually destroyed.
*These are appropriate questions for juries. The accepted
treatment, provided in the rule, is the treatment generally
given to questions of fact. The judge makes a preliminary
determination whether the foundation evidence is sufficient
to support a finding of fulfillment of the condition. If so, the
item is admitted.* If, after all the evidence on the issue is in,
the jury could not reasonably conclude that fulfillment of
the condition is established, the judge withdraws the mat-
ter from the jury's consideration."

Legislative Commentary to OEC 104, *reprinted in* Kirkpatrick,
*Oregon Evidence* § 104.02 (emphasis added). Courts
and commentators have noted that judges are no better
suited than juries to determine a straightforward factual
question like, "Who made the statement?" *See Konop v.
Rosen,* 425 NJ Super 391, 419-20, 41 A3d 773, 790-91 (App
Div 2012) ("[W]hen the proffered evidence is 'the [oppos-
ing] party's own statement,' *** there is no pre-condition
to admissibility requiring a legal conclusion drawn by

application of our Rules of Evidence to adduced facts. ***
The issue is purely a factual one—whether the party-
opponent made the statement."); 1 *McCormick on Evidence*
§ 53 (7th ed 2016) ("Conditional relevancy questions *** are
well within the jurors' competency; they involve the kind of
questions which jurors are accustomed to decide. *Did A say
such-and-such? Did B sign the letter offered in evidence?* The
jury's role and power on the merits would be greatly cur-
tailed if judges made the final decisions on these questions."
(Emphasis added.)).

OEC 801(4)(b)(A), in turn, arguably treats the ques-
tion of identity of the declarant as one of conditional rele-
vance. There is little in the rule itself that suggests that, for
purposes of a hearsay determination, the factual question
of identity is different in quality from the "identity" ques-
tion presented under OEC 901. If anything, the Legislative
Commentary to OEC 801 indicates that the question of
admissibility of a party's own statement under OEC 801
(4)(b)(A) is entirely subsumed by the existence of the condi-
tional fact: "Admissions are excluded from the category of
hearsay on the theory that their admissibility is the result
of the adversary system rather than satisfaction of the con-
ditions of the hearsay rule. *** No guarantee of trustwor-
thiness is required. The technical demands of the opinion
rule and the rule requiring personal knowledge are sus-
pended. *** A party's own statement is the classic exam-
ple of an admission." Legislative Commentary to OEC 801,
*reprinted in* Kirkpatrick, *Oregon Evidence* § 801.03. So long
as the identity of the declarant is established (in OEC 901's
terms, the out-of-court statement is one by the party oppo-
nent, as it is claimed to be), then it is not hearsay under OEC
801(4)(b)(A).[6]

Given the express treatment of identity in OEC 901,
and the drafters' awareness of the intersection between OEC
901 and OEC 801, we are not persuaded that our holding in
*Park* was plainly wrong. It is possible that the drafters of
the Oregon Evidence Code intended the singular predicate

---

[6] The only issue in this case is the preliminary factual determination as to
identity, and we express no opinion on how to characterize questions related to
representative capacity under OEC 801(4)(b)(A).

fact of identity of the declarant to be subject to two compet-
ing standards depending on whether the objection to admis-
sibility was rooted in OEC 901 or OEC 801. But, looking at
the text of Oregon's Evidence Code as a whole, it is equally
plausible that the drafters viewed the predicate fact of the
identity of an out-of-court declarant to be one of conditional
relevance assessed under the framework of OEC 901 and
OEC 104(2), in contrast to other predicate hearsay determi-
nations. That interpretation gives effect to OEC 901, which
expressly treats the question of "identification" as "a con-
dition precedent to admissibility," and OEC 104(2), which
carves out conditional relevance questions like the identity
of the author of a document as matters ultimately suited for
the jury, and OEC 801(4)(b)(A), which functionally treats the
identity of the declarant as a factual condition precedent to
admissibility.

Nor are we persuaded that the second inquiry in
*Carlson*—whether the policies underlying the hearsay rule
would be adequately served by treating the identity of the
declarant as a question of conditional relevance—compels
a different conclusion. In *Carlson*, the court explained why
leaving the "question of intent to adopt, agree or approve"
to the jury as one of conditional relevance would undermine
the hearsay rule:

> "The purpose of the hearsay rule is to guard against the
> risks of misperception, misrecollection, misstatement, and
> insincerity, which are associated with statements of per-
> sons made out of court. ***
>
> "There are several difficulties with leaving the ques-
> tion of intent to adopt, agree or approve to the jury as a
> question of conditional relevancy under OEC 104(2). If the
> OEC 104(2) conditional relevancy standard is employed,
> the legal policy underlying the hearsay rule would be
> furthered incompletely, if at all. The jury passing on the
> admission by conduct will have to hear not only evidence
> about the conduct and the surrounding circumstances, but
> also the out-of-court statement, as necessary predicates
> for understanding what the party allegedly adopted. For
> example, in the present case, the wife's accusatory state-
> ment, to which defendant's nonverbal conduct is a response,
> would have to be admitted to give meaning to defendant's
> conduct, and the accusation is relevant to prove the truth

of the accusation even though it may not be admissible for that purpose. A juror could (a) overlook the question of intent to adopt, agree or approve, and consider the truth of the matter asserted in the out-of-court statement, (b) use the out-of-court statement before considering and resolving the preliminary question of intent to adopt, agree or approve, or (c) consider the hearsay statement regardless of what conclusion is reached on the preliminary question of adoption or belief. If the evidence is inadmissible, *i.e.*, the jury does not find the preliminary fact (intent to adopt, agree or approve) to exist, preventing jury contamination may prove impossible. Additionally, a general verdict would not indicate the jury's resolution of whether intent to adopt existed. A record for appellate review would require a special set of preliminary jury findings.

"In short, we believe that judicial intervention is required to prevent improper use of evidence. The preliminary question of intent to adopt, agree or approve, therefore, should be left to the trial judge under OEC 104(1)."

311 Or at 213 (citations omitted).

Here, by contrast, where the *only* predicate question is the fact of identity of the declarant for purposes of OEC 801(4)(b)(A), those risks are less pronounced. Although we can envision situations where a juror might overlook the question of who made the statement or consider the statement without first considering and resolving that question, those possibilities are remote where the purported declarant is the party opponent. Jurors presumably will evaluate the source or author of a statement as part of their evaluation of its content, particularly when a statement is being attributed directly to a party.

Many other courts have approached the question of identity of the declarant in the same way as *Park*, but we acknowledge that there is a split of authority on this issue. *Compare Jones v. National American University*, 608 F3d 1039, 1045 (8th Cir 2010) (rejecting a hearsay challenge under the federal counterpart to OEC 801(4)(b)(A) on the ground that the testimony "was sufficient evidence for a jury to find that the exhibit was [the party opponent's] statement"), and *U.S. v. Tann*, 425 F Supp 2d 26, 38 (DDC 2006), *aff'd*, 532 F3d 868 (DC Cir), *cert den*, 555 US 1088 (2008)

(concluding that "the Government has met its burden under Federal Rule of Evidence 104(b) to establish that a reasonable juror could conclude that the e-mails in question were statements by Defendant, and therefore exempt from a hearsay analysis pursuant to Federal Rule of Evidence 801(d)(2)"), *with U.S. v. Garza*, 435 F3d 73, 77 (1st Cir), *cert den*, 547 US 1158 (2006) ("Questions of admissibility are decided by the court, Fed R Evid 104(a), using the preponderance of the evidence standard. \*\*\* So long as there is a preponderance of evidence indicating that it was Garza's voice on the tapes, the transcripts could be treated as containing his admission."), and *U.S. v. Lang*, 364 F3d 1210, 1222 (10th Cir 2004), *cert granted, judgment vac'd*, 543 US 1108, 125 S Ct 986, 160 L Ed 2d 1034 (2005), *and opinion reinstated in part*, 405 F3d 1060 (10th Cir 2005) (citing authority that the court decides questions under FRE 801(d)(2) and concluding that "[w]e find no law, and Mr. Lang presents none, stating that we apply any different standard to statements under Fed R Evid 801(d)(2)(A)").

Those cases treating identity as a question for the court typically have not grappled with the federal equivalent to OEC 901—FRE 901—or provided much in the way of explanation. *E.g.*, *Lang*, 364 F3d at 1222. But even commentators appear to disagree on the general treatment of the question as one of conditional relevance. *Compare* 8 *Handbook of Federal Evidence* § 901:5 n 6 (9th ed Nov 2020 Update) ("Despite the clear statement in Rule 901(a) itself that Rule 901(b)(5), along with all other Rule 901 illustrations, is a matter of conditional relevancy governed by Rule 104(b), Rule 104(a) has been incorrectly held applicable when it comes to a determination as to whether the defendant's was the voice heard on the tape recordings.") *with* Wright & Miller at § 5053.3 ("[D]espite an occasional deviation, it is generally agreed that the judge determines the facts necessary to show that a statement is a straight, adoptive, authorized, or vicarious admission under Rule 801(d)(2)(A) to (D)." (Footnotes omitted.)).

However, for the reasons stated above, we adhere to our holding in *Park* and conclude that the question of identity of the declarant of an out-of-court statement presents one of conditional relevance that is evaluated under

the same standard for identity as a condition precedent to admissibility set forth in OEC 901. If, over a hearsay objection, the proponent of the evidence presents a *prima facie* case that the party opponent is the declarant, the trial court must conditionally admit the evidence and instruct the jury to consider the evidence only if it determines that the party opponent was, in fact, the declarant.

B.   *Application in Trial*

On issues of authentication, after the trial court determines that the proponent of the evidence has met its *prima facie* burden—*i.e.*, that there is sufficient evidence that a trier of fact could conclude that the item is what the proponent claims it to be—the evidence goes to the jury. If the jury ultimately concludes that the item isn't what the proponent claims it to be, it becomes an issue of weight. Identity for hearsay purposes is different. After submission of the statement to the jury, if the jury ultimately concludes that the statement was not by a party opponent, the statement should not be in the evidentiary record for consideration at all. Accordingly, the court will need to provide the jury a limiting instruction if the evidence is conditionally admitted. A proposed instruction could resemble the following:

> "Members of the jury, you have heard testimony or seen documents purporting to be statements by defendant; specifically [DESCRIBE HEARSAY STATEMENTS]. Before you may consider such statements as evidence, you must first determine, by a preponderance of the evidence, that defendant, in fact, made the statement. If you are unable to determine [UNANIMOUSLY IN CRIMINAL CASES OR BY THREE-FOURTHS OF THE JURY IN CIVIL CASES], by a preponderance of the evidence, that defendant made the statement, that statement is not part of the evidence of this case, and you may not consider it in your deliberations."

That instruction is similar to the instructions given in other jurisdictions treating identity, for purposes of hearsay, as an issue of conditional relevance. *See, e.g., Com. v. Oppenheim*, 86 Mass App Ct 359, 365-66, 16 NE3d 502, 508 (2014) (approving of the trial court's instruction that the jury "'could consider an [instant messaging] conversation if 'convince[d]' that the defendant 'was the author of those portions of the conversation *** attributed to him ***. If the

evidence does not persuade you that [the defendant] was the author of those statements, you must disregard the instant message conversation in your deliberations.'"); *Konop*, 425 NJ Super at 422, 41 A3d at 792 ("If the case proceeds to trial, the judge must provide a limiting instruction that the disputed notation may only be considered if the jury finds by a preponderance of the evidence that defendant made the statement."); Kevin F. O'Malley, Jay E. Grenig, and Hon William C. Lee, 3 *Federal Jury Practice & Instructions* § 104:41 (6th ed Feb 2021 Update) ("Plaintiff _____ has presented some evidence that the [describe] report is genuine. Defendant _____ has submitted rebuttal evidence challenging the authenticity of the report. Plaintiff _____ has the burden of proving the report's authenticity by a preponderance of the evidence. If you find plaintiff _____ has met that burden, you may consider the report during your deliberations. But, if you find plaintiff _____ has not met that burden, you must completely disregard the report."); Judicial Council Of California Civil Jury Instruction 212 (2021 Edition) ("A party may offer into evidence any oral or written statement made by an opposing party outside the courtroom. When you evaluate evidence of such a statement, you must consider these questions: 1. Do you believe that the party actually made the statement? If you do not believe that the party made the statement, you may not consider the statement at all. 2. If you believe that the statement was made, do you believe it was reported accurately? You should view testimony about an oral statement made by a party outside the courtroom with caution.").

Finally, reflecting *Carlson*'s concern that a general verdict might not indicate the jury's resolution of the preliminary question, and a record for appellate review would require a special set of preliminary jury findings, counsel may need to request an interrogatory verdict form (for criminal cases), or a special verdict or interrogatory form for civil cases in order for an appellate court to know whether the jury did, or did not, "admit" the statement into the evidentiary record for purposes of assessing any prejudice in the event that the trial court erred in conditionally admitting the evidence. *See State v. Payne*, 298 Or App 411, 427, 447 P3d 515 (2019) ("In criminal cases, the special verdict

is statutorily prohibited. However, \*\*\* the general verdict with interrogatories \*\*\* is not prohibited by ORS 136.485.").

Those procedures would sufficiently minimize the chances that the jury would skip over a dispute about the identity of the speaker when considering the statements, or that error in conditionally admitting the evidence would be unreviewable. *See, e.g., Konop*, 425 NJ Super at 422, 41 A3d at 792 ("The parties are free to address with the judge whether a preliminary interrogatory should be submitted to the jury since the notation provides the only support for Solny's opinion that defendant deviated from accepted medical standards.").

C.  *Admissibility of the Facebook Messages*

With that understanding of the trial court's role, the authentication and hearsay questions raised on appeal essentially turn on the same inquiry under OEC 901: Did the state present a *prima facie* case that the Facebook messages were messages sent by defendant, as the state claimed them to be?

That question is another variation on the theme we addressed in *Sassarini*: When can we trust digital evidence? Social media accounts like Facebook, Twitter, and Instagram pose unique authentication concerns. They can be created by anyone, with profile information that can be entirely fictitious; photos and other content on the account may or may not correspond to the account holder; they can be maintained or used by anyone with the account credentials, whether or not that person is the creator or account holder—including by persons who are not authorized users.

As with all questions of authentication under OEC 901, the showing required to authenticate evidence of postings from social media accounts is contextual. By its nature, a message from a Facebook account with a particular profile can be "authentic" in different senses, depending on what its proponent is claiming it to be. If a party is offering evidence that a Facebook message originated from an account profile—with no additional claim of evidentiary value as to authorship, account ownership, or the content of

the post—the proponent must authenticate only that much: that it is a message that originated from that account. *See Sassarini*, 300 Or App at 126 ("[A]s we understand OEC 901, particularly in light of the official commentary to that rule, the requirements for authentication in Oregon will depend on the particular circumstances and the nature of the evidence that is offered."); *see generally Authentication of Social Media Records and Communications*, 40 ALR 7th Art 1 (2019) ("[W]here the evidentiary value of a writing does not depend on a showing of the truth of its contents, or that a particular person wrote it, its authentication need not relate to such matters, but needs only to extend to whatever facts are necessary to permit a finding that the document is what its proponent claims it to be.").

But where a proponent claims more—that the message originated from a particular account and *was authored by a particular person*—more is required. *See U.S. v. Vasquez-Soto*, 939 F3d 365, 373 n 5 (1st Cir 2019) ("[I]f a proponent of social media evidence seeks to introduce the evidence to show that 'the [social media] page or a post is that of a particular person, authenticity standards are not automatically satisfied by the fact that the post or the page is in that person's name *** because someone can create a *** social media page in someone else's name.'" (Quoting Hon Paul W. Grimm *et al*, *Authenticating Digital Evidence*, 69 Baylor L Rev 1, 31-32 (2017).)). That is the circumstance in this case, in which the state asserts that the Facebook messages were not only from the Acosta profile, but were sent by defendant.

In *Sassarini*, we explained that OEC 901 codified a "more flexible approach to authentication" in which the examples provided in the rule "are not exclusive allowable methods but are meant to guide and suggest, leaving room for growth and development in this area of the law." 300 Or App at 127 (quoting Legislative Commentary to OEC 901, *reprinted in* Kirkpatrick, *Oregon Evidence* § 901.02). The examples in subsection (2) of the rule provide:

"(a) Testimony by a witness with knowledge that a matter is what it is claimed to be.

"(b)   Nonexpert opinion as to the genuineness of handwriting, based upon familiarity not acquired for purposes of the litigation.

"(c)   Comparison by the trier of fact or by expert witnesses with specimens which have been authenticated.

"(d)   Appearance, contents, substance, internal patterns or other distinctive characteristics, taken in conjunction with circumstances.

"(e)   Identification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker.

"(f)   Telephone conversations, by evidence that a call was made to the number assigned at the time by the telephone company to a particular person or business, if:

"(A)   In the case of a person, circumstances, including self-identification, show the person answering to be the one called; or

"(B)   In the case of a business, the call was made to a place of business and the conversation related to business reasonably transacted over the telephone.

"(g)   Evidence that a writing authorized by law to be recorded or filed and in fact recorded or filed in a public office, or a purported public record, report, statement, or data compilation, in any form, is from the public office where items of this nature are kept.

"(h)   Evidence that a document or data compilation, in any form:

"(A)   Is in such condition as to create no suspicion concerning its authenticity;

"(B)   Was in a place where it, if authentic, would likely be; and

"(C)   Has been in existence 20 years or more at the time it is offered.

"(i)   Evidence describing a process or system used to produce a result and showing that the process or system produces an accurate result.

"(j)   Any method of authentication or identification otherwise provided by law or by other rules prescribed by the Supreme Court."

None of those examples specifically address social media posts or digital evidence of this nature,[7] but some of them are helpful in determining the "certain minimum assurances" necessary to establish that a post originated from a particular author.

One of the examples is "[t]estimony by a witness with knowledge that a matter is what it is claimed to be." To authenticate a social media message as being from a particular author, the proponent of that evidence could offer testimony by someone with personal knowledge that a message was sent from a particular account—either the sender or someone who watched the sender post the message. But that is not the evidence that the state offered in this case; it has no witnesses with knowledge that the Acosta profile was created by defendant, let alone that the messages were authored and sent by defendant.

It is also possible to authenticate social media evidence through expert testimony about the systems that created an account and the persons with which they are associated. *See* OEC 901(2)(c) (authentication by comparison by "expert witnesses with specimens which have been authenticated"); OEC 901(2)(i) (authentication by evidence "describing a process or system used to produce a result and showing that the process or system produces an accurate result"). The state did not offer any forensic evidence in this case; the evidence that was introduced came from the *detective's* phone, not the sender's device, and there was no expert testimony about the origin of the messages, what it takes to create a Facebook profile, or the security protocols of Facebook. *Cf. Grimm et al*, 69 Baylor L Rev at 32 ("Most courts have found that it is enough for the proponent to show that the pages and accounts can be tracked through

---

[7] As we noted in *Sassarini*, 300 Or App at 128 n 2, the Federal Rules of Evidence were changed in 2017 to address "'[d]ata copied from an electronic device, storage medium, or file, if authenticated by a process of digital identification, as shown by a certification of a qualified person.'" FRE 902(14). The Oregon Evidence Code has not been similarly amended to address digital identification.

internet protocol addresses associated with the person who purportedly made the post.").

Another possible means of authentication of social media evidence, and the one on which the state relies, is "[a]ppearance, contents, substance, internal patterns or other distinctive characteristics, taken in conjunction with circumstances." OEC 901(2)(d). For that example, the Legislative Commentary provides additional guidance, adopted from *Weinstein Evidence: Commentary on Rules of Evidence for the United States Courts and Magistrates.* (M. Bender 1976):

> "(i)   *Subject Matter.* A document or telephone conversation may be shown to have emanated from a particular person or business by the fact that it would be unlikely for anyone other than the purported author or declarant to be familiar with the subject matter of the document or conversation.

> "(ii)   *Physical Attributes.* The appearance, physical characteristics, and identifying marks of a writing may sufficiently identify the source of the document.

> "(iii)   *Internal Patterns.* Writings may be authenticated by evidence that the internal word or thought patterns are particularly characteristic of the purported writer.

> "(iv)   *External Circumstances.* Circumstances preceding, surrounding and following the transmission of a writing may sufficiently authenticate the writing.

> "(v)   *Reply-Letter Technique.* A letter or telegram may be authenticated by testimony or other proof that the writing was sent in reply to a duly authenticated writing."

Commentary to OEC 901, *reprinted in* Kirkpatrick, *Oregon Evidence* § 901.02 (citations omitted).

The example and commentary predate our digital world, but, at their core, reflect the view that the substance and circumstances of messages and conversations can be so highly correlative of identity that they meet the minimum assurance of trustworthiness required of evidence that will be relied upon in a court of law. That is true of digital evidence as well, and the examples and commentary can be adapted to the social media context, so long as we account

for the ease (and frequency) of manipulation of social media and other digital messaging. *See, e.g.*, *Griffin v. State*, 419 Md 343, 358, 19 A3d 415, 424 (2011) ("[W]e recognize that other courts, called upon to consider authentication of electronically stored information on social networking sites, have suggested greater scrutiny because of the heightened possibility for manipulation by other than the true user or poster.").

In a digital world, the mere "appearance" of a document, or that it comes from a particular account, is not alone a strong indicator of authorship, for the reasons discussed above. In the absence of personal knowledge of the source of a document to explain its appearance, or expert testimony about the document, the appearance of a document proves only that much: what it *appears* to be.

However, the other factors listed—content, subject matter, internal patterns, or other distinctive characteristics—still retain their import in determining the author of a social media posting as they would with a nondigital communication. The fact that it is "unlikely for anyone other than the purported author or declarant to be familiar with the subject matter of the document or conversation" can indicate the source of a social media message, just as it could with other types of messages. Likewise, the "circumstances preceding, surrounding and following the transmission of a writing may sufficiently authenticate the writing" where that circumstantial proof is sufficiently corroborative of authorship—including whether the messages at issue were sent in reply to a duly authenticated message.

The burden on the proponent at this stage is not to conclusively establish authorship; rather, as we emphasized in *Sassarini*, the question is whether the proponent established a *prima facie* case such that "a reasonable person would be satisfied" that defendant was the author of the messages. 300 Or App at 126. That is a question of legal sufficiency, which we review for errors of law. *State v. H. D. E.*, 304 Or App 375, 383, 467 P3d 771, *rev den*, 367 Or 220 (2020).

Viewing the record through that lens, we conclude that the trial court erred in excluding the Facebook

messages, because the content of the messages and the circumstances in combination were sufficient for a reasonable person to be satisfied that defendant authored them in response to messages from the detective.

First, the appearance of the Facebook messages, although not dispositive, was entirely consistent with the Facebook profile being defendant's account and the messages originating from that account: The messages appeared to come from an account that bore defendant's name and included pictures that matched defendant's physical appearance.

In addition, the content of the messages, when considered under the circumstances in which they were received by the detective, included substance that was uniquely associated with defendant—or, at least, with the small group of persons at the Sonya residence and then in the truck. During the exchange, the detective asks, "Hey bro any word," and received a response from the Acosta profile on July 2 stating, "Yeah here at Sonia house in Winston come through g." The detective testified that, based on that information, he set up surveillance on the following day and saw defendant come out of that residence—a fact that circumstantially links defendant to the messages from the account, whether or not they were sent by him specifically. The detective also testified that he received a message saying, "I'm on my way in ten minutes" at just about the time that the Acosta profile indicated that the sender's ride would be arriving. And he then saw defendant come out of the Sonya residence, put a backpack in the back of the truck, and get into the right front passenger seat of the gray truck—again, circumstances that corroborate that defendant was simultaneously behaving in ways that were consistent with being the sender of the messages—or, at the very least, among a very small group of people who were using the Acosta profile to communicate with the detective.

Once the truck left, with defendant in it, the messages later exchanged between the detective and the Acosta profile communicated knowledge that again was uniquely associated with the occupants of the gray truck, including

its approximate distance from Southgate Market and, finally, its arrival at the market.

Based on those corroborating circumstances, a reasonable person would have little trouble concluding that the messages were sent by someone who was first at the Sonya residence and later an occupant of the truck.

Defendant does not seriously contend otherwise. What he argues, instead, and what the trial court appears to have concluded, is that there is insufficient evidence that it was defendant, not one of the other occupants, who had control of the phone in the truck and sent the messages. The trial court reasoned, "we are all supposed to believe that these messages came from [defendant's] phone and yet, we haven't really established that he was ever in control of the phone or that he was using it[.]"[8]

The state did not *conclusively* establish that defendant, and not one of the other occupants of the vehicle, was the person who sent the messages, and did not *conclusively* establish that he used the phone that was found within his reach in the gray truck. But the state, for purposes of authentication, was not required to do so. A reasonable person would be satisfied that, given all the circumstances, it was defendant and not one of the other occupants who was sending messages from the Acosta profile: A Facebook account matching defendant's name and profile picture; messages that were consistent with defendant's presence and movements at the Sonya residence; and messages that were consistent with his location while riding in the truck. Even if it were *possible* that someone else sent the messages from the profile matching defendant's name and picture, the evidence was sufficient for a reasonable person to be satisfied that it was, in fact, defendant who sent them.[9] *Accord*

_____

[8] Defendant argues, consistently with his view that identity is a preliminary question of fact for the trial court, that we should defer to the trial court's findings. Even apart from rejecting that view of the trial court's factfinding role, we are not persuaded that the trial court made a factual finding regarding identity. The court appears to have been persuaded by the evidence ("Do I think that [defendant] sent those messages? Yeah. I do.") but concluded that the standard was higher as a matter of law ("Is it legally established that [defendant] sent those messages? No. It's not legally established.").

[9] The discrepancy between a "lifted" and "lowered" truck does not change the calculus for purposes of authentication.

*State v. Smith*, 179 Conn App 734, 765-66, 181 A3d 118, 136, *cert den*, 328 Conn 927 (2018) (rejecting the view that "the state bore the insurmountable burden of ruling out any possibility that the message was not sent by the defendant"); *see also U.S. v. Browne*, 834 F3d 403, 411-15 (3d Cir 2016), *cert den*, 137 S Ct 695 (2017) (Facebook chats were sufficiently authenticated where witnesses testified that they communicated with the creator of the page through Facebook, they could identify the creator, and biographical data on Facebook matched the defendant).

Because the state presented sufficient evidence from which a reasonable trier of fact could conclude that defendant sent the Facebook messages, the trial court erred in excluding them under OEC 901. For the same reason, the court erred in excluding them on hearsay grounds. Because there was sufficient evidence to show that defendant was the declarant, the Facebook messages were admissible, subject to the jury's finding on that issue.

Reversed and remanded.