560 October 23, 2024 No. 744

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

CARLOS EVENCIO HURTADO,
*Defendant-Appellant.*

Washington County Circuit Court
20CR49552; A177208

Ramón A. Pagán, Judge.

Argued and submitted June 20, 2023.

Meredith Allen, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Christopher A. Perdue, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, and Powers, Judge, and Hellman, Judge.

POWERS, J.

Affirmed.

**POWERS, J.**

Defendant appeals from a judgment convicting him of sexual abuse in the first degree, ORS 163.427, for touching L's breasts and mouth while she was asleep.[1] In his first assignment of error, defendant argues that the trial court erred in admitting a screenshot of text messages because it was not properly authenticated. In his view, the state could not satisfy the authentication requirement under OEC 901 without evidence from a party to the text conversation or someone with direct knowledge that defendant was one of the parties. As explained below, given the evidence surrounding the text messages, we conclude that the state established a *prima facie* case for authenticity. Thus, the trial court did not err in allowing the jury to consider the evidence so that it could make the ultimate decision on whether the text messages were from defendant. In his second assignment of error, defendant contends that the court erred by improperly commenting on the evidence when it instructed the jury on the definition of sexual contact. We conclude that the challenged instruction was not a comment on the evidence and that the trial court did not err when it instructed the jury. Finally, in his third assignment, defendant asserts that the court erred in sentencing him to a 75-month term of incarceration because that sentence is disproportionate under both the state and federal constitutions. We conclude that defendant's sentence is not disproportionate under either the state or federal constitution. Accordingly, we affirm.

## I.  BACKGROUND

We begin with a brief overview of the background facts, which are mostly undisputed, and describe additional facts when we address defendant's assignments of error.

L was visiting her sister, Davidson-Frye, and staying at her sister's apartment. Davidson-Frye had two roommates: Ferrell, who was her boyfriend, and defendant. L testified that she was sleeping on the couch one evening and woke up to defendant "fondling" and "grabbing" her breasts over her clothing and kissing her lips. L told defendant,

---

[1] ORS 163.427 has been amended since defendant committed the crime. Or Laws 2021, ch 82, § 7. Those amendments do not affect our analysis, however, and therefore we refer to the current version of the statute in this opinion.

"Knock it off. Stop." Then defendant stood up and started singing a "vulgar" song to L. L testified that, following the incident, she saw defendant standing behind the couch masturbating. Davidson-Frye testified that she told defendant to leave, and he eventually left for the night. She further testified that defendant returned to the apartment the next day and apologized to her.

Defendant was subsequently charged with six counts of sexual abuse in the first degree and one charge of public indecency. A jury convicted defendant of two counts of sexual abuse in the first degree for touching L's breasts over her clothing and kissing her on the mouth.[2] Ultimately, the trial court sentenced defendant to a 75-month mandatory minimum sentence under ORS 137.700(2)(a)(Q) for the single, merged count of first-degree sexual abuse. This timely appeal follows.

We address each of defendant's three assignments of error below and conclude that none of them provide a basis for reversal.[3] Accordingly, we affirm.

## II.  ANALYSIS

### A.  *Authentication of Text Messages*

Defendant first assigns error to the trial court's admission of text messages over his authentication objection. We review whether a trial court properly admitted evidence under OEC 901 to determine whether there was sufficient evidence to support sending the issue of authenticity to the factfinder. *State v. Spencer*, 304 Or App 262, 263, 467 P3d 73, *rev den*, 367 Or 115 (2020).

---

[2] The jury acquitted defendant on the first-degree sexual abuse counts related to using forcible compulsion and touching L's vaginal area, and the court dismissed the public indecency charge on the state's motion.

[3] Defendant raises a fourth assignment of error challenging the imposition of a 10-year term of post-prison supervision (PPS) without deducting the time of incarceration. *See* ORS 144.103(1) (providing that the term of PPS "when added to the term of imprisonment" equals the maximum statutory indeterminate sentence). The state concedes that the trial court erred but notes that the court entered an amended judgment clarifying that the time defendant served in prison would be subtracted from the 10-year PPS term. Accordingly, we do not address defendant's final assignment of error because it is moot. *See, e.g., State v. Merrill*, 314 Or App 460, 461, 495 P3d 219 (2021), *rev den*, 370 Or 789 (2023) (declining to reach an assignment of error that was mooted because the trial court "had properly and helpfully fixed the problem identified" by the assignment of error).

Before trial, defendant filed a motion *in limine* to exclude text messages that were purportedly sent by defendant. The evidence at issue was a screenshot of a series of text messages sent to Ferrell. The screenshot shows that the messages were from "Carlos," which is defendant's first name, and that they were sent on a Friday between 12:49 and 12:53 p.m. There is no phone number associated with the contact's name and no date. The text messages provided:

"Sorry for being out of hand[.]

"I think the alcohol caught up to me I was a stupid drunk and I need to be more careful[.]

"I feel like an idiot today I just hope I can learn from this and move forward[.]

"I'm overwhelmed with life right now it's no excuse for me being dumb again I apologize[.]"

To rule on the admissibility of the text messages, the court held an OEC 104 hearing outside the presence of the jury. To authenticate the text messages, the state called Davidson-Frye as a witness. Although the text messages were sent to Ferrell, Davidson-Frye testified that she was present with Ferrell when he received the messages and that he showed the messages to her immediately. Davidson-Frye further testified that she scrolled up in the message chain and saw that there were old messages from defendant. She explained that the prior messages provided, "Sorry, man. I don't want to get in the middle of your guys' fight." She further explained that she believed that the prior messages were from defendant because she and Ferrell had "gotten into it, and they were discussing the previous couple nights when [she] and [Ferrell] fought." She testified that the messages were "definitely from [defendant]." The trial court admitted the text messages, reasoning that Davidson-Frye's testimony that she scrolled up through the text message thread and saw other messages describing a situation in which only defendant would have witnessed was sufficient to authenticate that defendant sent the text messages.

On appeal, defendant asserts that the state could not authenticate the text messages under OEC 901 without evidence from a party to the conversation or someone

with direct knowledge that defendant was one of the parties. Moreover, defendant contends that Davidson-Frye's testimony authenticates only Ferrell's side of the conversation and that there is nothing uniquely associated with defendant in the conversation to sufficiently authenticate that he had sent the messages. The state remonstrates, among other arguments, that it met its burden to prove that the messages were from defendant because Davidson-Frye's testimony established that other messages in the text chain showed particularized content that defendant uniquely would know about and would have reason to discuss, specifically the fight between Davidson-Frye and Ferrell.

As explained below, because the content and circumstances of the text messages are sufficient to authenticate the messages for purposes of OEC 901, we conclude that the trial court did not err.

For evidence to be admissible, the proponent of the evidence must "establish a *prima facie* case of authenticity." *State v. Sassarini*, 300 Or App 106, 126, 452 P3d 457 (2019). Once the proponent has made the *prima facie* showing, the factfinder determines the authenticity of the evidence. *Id.* at 126-27. The authentication requirement "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." OEC 901(1). Examples of sufficient authentication include "[t]estimony by a witness with knowledge that a matter is what it is claimed to be" and "[a]ppearance, contents, substance, internal patterns or other distinctive characteristics, taken in conjunction with circumstances." OEC 901(2)(a), (d).

The question of how to authenticate a digital message that was sent by a particular person was considered in *State v. Acosta*, 311 Or App 136, 489 P3d 608 (2021), *vac'd*, 369 Or 338 (2022). After we issued our decision in that case, the defendant petitioned for review, and while the petition was pending, the Supreme Court vacated our decision because the defendant died during the pendency of the proceeding. We now readopt and reaffirm our reasoning in *Acosta* and apply it to this case.

If the evidentiary value of a digital message depends on it being sent by a particular person, then the proponent

must authenticate the evidence by demonstrating that the message was sent by that person. *Id.* at 162. A message coming from an account alone is not a strong indicator of authorship. *Id.* at 166. Although OEC 901 does not specifically address digital evidence, its principles "are helpful in determining the 'certain minimum assurances' necessary to establish that a post originated from a particular author." *Id.* at 164. That is because OEC 901 codified a "more flexible approach to authentication" in which the examples in the rules are not "exclusive allowable methods"; rather, as the Legislative Commentary explains, they are "meant to guide and suggest, leaving room for growth and development in this area of the law." *Sassarini*, 300 Or App at 126 (internal quotation marks omitted). The examples in OEC 901 and the commentary "can be adapted to the social media context, so long as we account for the ease (and frequency) of manipulation of social media and other digital messaging." *Acosta*, 311 Or App at 165-66.

Applying the underlying principles of OEC 901 to the social media messages at issue in *Acosta*, we explained that, among other considerations, "the content of the messages, when considered under the circumstances in which they were received" included substance that was "uniquely associated" with the defendant and a small group of people. *Id.* at 167. Thus, we concluded that the state offered sufficient evidence not to "conclusively" establish that the defendant sent the messages but sufficient such that a "reasonable person would be satisfied that, given all the circumstances," the defendant, and not another person, had sent the messages. *Id.* at 168.

In this case, we conclude that the state offered sufficient evidence to create a *prima facie* case that defendant sent the text messages. Davidson-Frye's testimony established that the "contents, substance, internal patterns or other distinctive characteristics," and the circumstances of the text messages demonstrated that defendant sent the messages. Davidson-Frye testified that she had knowledge of the contents of the messages and believed that they were from defendant. Specifically, she testified that she scrolled up in the text chain and saw other messages regarding an

argument that she had had with Ferrell that defendant knew about. Thus, the content of the prior messages discussing not wanting to get in the middle of a fight is "uniquely associated" with defendant because he was Davidson-Frye's and Ferrell's roommate and had witnessed one of their recent arguments. We conclude that, although Davidson-Frye's testimony did not conclusively establish that defendant authored the text messages, her testimony was sufficient such that a "reasonable person would be satisfied that, given all the circumstances," defendant had sent the messages. Thus, the state met its threshold to present a *prima facie* case of authenticity such that the question of authenticity was properly sent to the jury as the factfinder. Accordingly, the trial court did not err in admitting the text messages.

B. *Jury Instruction Defining "Sexual Contact"*

In defendant's second assignment of error, he challenges the jury instruction defining "sexual contact," which is an element of first-degree sexual abuse. ORS 163.427 provides, in part:

> "(1)　A person commits the crime of sexual abuse in the first degree when that person:
>
> "(a)　Subjects another person to sexual contact and:
>
> "* * * * *
>
> "(C)　The victim is incapable of consent by reason of being *** physically helpless ***."

The trial court provided the jury with instructions relating to the various elements of first-degree sexual abuse, including the definitions of "sexual contact" and "physically helpless." The instructions further included an explanation as to what constitutes an intimate body part, which is a component of the definition of "sexual contact." At issue here is the jury instruction defining the "sexual contact" element of the crime. The trial court's oral instruction on that point provided:

> "'Sexual contact' means any touching of the sexual or other intimate parts of a person or causing such person to touch the sexual or other intimate parts of the actor for the purpose of arousing or gratifying the sexual desire of either party.

"The contact need not be directly with the other person's body. It is sufficient if the person touches the other person's sexual or intimate parts through clothing."

On appeal, defendant challenges the second part of the instruction, *viz.*, that the "contact need not be directly with the other person's body. It is sufficient if the person touches the other person's sexual or intimate parts through clothing." In defendant's view, the trial court impermissibly commented on the evidence because the instruction informed the jury that touching an intimate part over the clothing is sufficient to satisfy the "sexual contact" element of the first-degree sexual abuse offense. Defendant contends that the instruction "did not neutrally inform the jury on factors that it may consider in determining whether the touching was sexual contact" and instead informed the jury as to how certain evidence related to an element of the offense and directed the jury on the inference that could be drawn. Specifically, defendant asserts that "telling the jury that the contact 'need not' be with the person's body and that the evidence was 'sufficient' to find sexual contact was akin to saying that that evidence was 'itself' evidence of sexual contact." Thus, as we understand defendant's argument, he does not contest the accuracy of the instruction—*viz.*, that touching over clothing can constitute sexual contact—rather, defendant contends that the instruction incorrectly narrowed the jury's task to focus solely on whether defendant touched the victim over her clothing, thereby effectively negating the other requirements necessary to establish "sexual contact."

The state remonstrates that the instruction did not improperly comment on the evidence because it merely clarified that touching over the victim's clothing qualified as "sexual contact" and that the jury still had to conclude that the evidence also satisfies the other requirements necessary to establish "sexual contact." Further, the state contends that, even if the trial court erred, any instructional error was harmless. Defendant replies that the error was not harmless because the instruction may have led the jury to find that there was sexual contact when it otherwise may not have.

We review whether a jury instruction improperly comments on the evidence for legal error. *State v. Newcomer*,

265 Or App 706, 707, 337 P3d 137 (2014). To determine whether it was error for a trial court to give a particular jury instruction, we do not review the challenged instruction in isolation; rather, we review the instructions as a whole to determine whether they have accurately informed the jury of the law. *Wright v. Turner*, 368 Or 207, 224, 489 P3d 102 (2021); *State v. Woodman*, 341 Or 105, 118, 138 P3d 1 (2006). A trial court may not instruct the jury "with respect to matters of fact, nor comment thereon." ORCP 59 E. A court impermissibly comments on the evidence "when it gives a jury instruction that tells the jury how specific evidence relates to a particular legal issue." *State v. Hayward*, 327 Or 397, 410-11, 963 P2d 667 (1998). The court may not instruct the jury to draw an inference against the defendant in a way that "relieve[s] the state of its burden of proving each element of the crime beyond a reasonable doubt." *Id.* at 411. Nevertheless, an instruction constitutes reversible error only if, considering the instructions as a whole, the defendant was prejudiced. *State v. Lopez-Minjarez*, 350 Or 576, 584-85, 260 P3d 439 (2011).

The wording of the challenged instruction comes from our decision in *State v. Buller*, 31 Or App 889, 891, 571 P2d 1263 (1977) (concluding that evidence of intentional touching of the buttocks through clothing was sufficient to create a jury question as to whether the victim's buttocks were "intimate parts"). In *Buller*, we cited to the Commentary to the 1970 Proposed Criminal Code for first-degree sexual abuse, explaining that "the contact need not be directly with the person's body; it is sufficient if the defendant touches the victim's sexual or intimate parts through clothing." *Id.* (quoting Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report §§ 115-16, 122 (July 1970)).

For decades, both the Oregon Supreme Court and we have urged parties to exercise caution when lifting language directly from case law for use as jury instructions. *See, e.g.*, *Rogers v. Meridian Park Hospital*, 307 Or 612, 616, 772 P2d 929 (1989) ("[B]ecause many appellate opinions are written with no view that they will be turned into instructions, care must be exercised in using the language of these

opinions for instructions to juries."); *State v. Morales*, 307 Or App 280, 285 n 4, 476 P3d 965 (2020) (explaining that the case illustrates the "risk of using wording from opinions as jury instructions and, in particular, the risk of crafting a jury instruction from statements in a case intended to describe why particular evidence was sufficient"). We, again, reiterate that caution should always be taken when writing jury instructions that borrow language from an appellate decision. In this case, when read in isolation, the instruction could be interpreted to instruct the jury that, if it found that defendant touched L on an intimate part over her clothing, then it did not need to find the sexual purpose part of the sexual contact element. That narrow reading, however, ignores the other parts of the instruction that specifically informed the jury of the other parts of the definition of sexual contact.

In evaluating the entire jury instruction defining "sexual contact," the jury was instructed that the definition includes three parts: "touching," "the sexual or other intimate parts of a person," and "for the purpose of arousing or gratifying the sexual desire of either party." The part of the instruction at issue in this case instructs the jury as to only two parts of the definition of sexual contact—that touching over the clothing of an intimate part is sufficient to constitute touching within the meaning of first-degree sexual abuse. However, the instruction when viewed as a whole also told the jury that any touching had to be for a sexual purpose. Thus, it is unlikely that the jury would have thought that defendant touching an intimate part of L over her clothing was sufficient to satisfy the entire "sexual contact" element. That is, the jury probably did not conclude—based on the entire instruction defining "sexual contact"—that it was required to find the sexual contact element if defendant touched the victim on her intimate parts over her clothes, because the jury was also told that there was an additional aspect to the definition—sexual purpose—that it had to consider. When viewed as a whole, the jury instructions accurately define the various requirements for "sexual contact" and correctly explain that touching an intimate part over clothing can constitute sexual contact if it is done with the requisite sexual purpose.

Moreover, a review of the parties' closing arguments confirms our conclusion that the jury instructions as a whole accurately informed the jury of the law. For instance, a review of the state's closing argument shows that it sought to prove each element of the crime and it did not suggest that finding that defendant touched L on an intimate part over her clothing, alone, was sufficient to satisfy the sexual contact element. The state's closing argument emphasized all aspects of the element of sexual contact, including that "it's got to be a touching of a sexual or intimate part, and when the person does that, there needs to be evidence that they did that for a sexual reason." The state further distinguished the element of sexual contact from "accidental touchings or something that wouldn't have a sexual purpose." The state referenced the substance of the jury instructions by explaining that "the touching does not need to be skin-to-skin contact. So this will be included in your instructions. It includes that—something that is over the clothes as well." In short, the state's closing argument, which preceded the trial court's instructions, emphasized to the jury that it needed to find all parts of the element of sexual contact. Although the state did discuss that the contact can be over the clothes, it did not argue that that alone would be sufficient to find the element of sexual contact. Moreover, defendant's closing argument further emphasized to the jury that it had to find all parts of the sexual contact element, including whether defendant touched L at all, and if defendant did touch L, "whatever contact there was, was it sexual contact, in that whole scheme of things?"

In sum, viewing the jury instructions as a whole, the trial court accurately defined "sexual contact" and correctly explained that touching an intimate part over clothing can constitute sexual contact if it is done with the requisite sexual purpose. Accordingly, the trial court did not err.

C. *Disproportionality Challenge to 75-Month Sentence under the State and Federal Constitutions*

In defendant's third assignment, he challenges his 75-month sentence, arguing that it is constitutionally disproportionate under Article I, section 16, of the Oregon Constitution and the Eighth Amendment to the United

States Constitution. We review the proportionality of a sentence for legal error, and we are bound by the trial court's findings of historical fact if supported by evidence in the record. *State v. Conrad*, 280 Or App 325, 333-34, 381 P3d 880 (2016), *rev den*, 360 Or 851 (2017). In the absence of express factual findings, we presume that the court resolved factual disputes consistently with its ultimate decision. *Id.* at 334.

At sentencing, the state requested that the court impose the 75-month mandatory minimum sentence pursuant to ORS 137.700(2)(a)(Q) for the single merged count of first-degree sexual abuse. Defendant argued that the sentence was constitutionally disproportionate as applied to defendant's acts. The trial court ultimately imposed the 75-month sentence, reasoning that it was not disproportionate because of defendant's criminal history involving domestic violence and the nature of the incident. The court explained, in part:

> "And as noted, you do have one strike out of those three right there, which is the criminal history; you don't come in with clean hands, necessarily. They're not sex cases; some of them involve domestic violence, though, and women in your life. So that's not helpful. ***
>
> "*****
>
> "But the fact of the matter is, is you had an incapacitated victim who was asleep. And I know there were allegations that were more serious—that you were acquitted of, but, at the same time, I think [the state] is right to *** couch this as quite a disturbing stranger-victim, incapacitated, and they wake up to being sexually abused. And then the conduct after that's really not helping you—with the masturbation ***."

On appeal, defendant renews his argument that the sentence is constitutionally disproportionate.

Article I, section 16, provides, "Cruel and unusual punishments shall not be inflicted, but all penalties shall be proportioned to the offense." A punishment violates Article I, section 16, only if it is so disproportionate to the offense as to "shock the moral sense" of reasonable people. *State v. Rodriguez/Buck*, 347 Or 46, 57-58, 217 P3d 659 (2009).

Because the role of courts is not to "second-guess" the penalties enacted by the legislature, we will determine that a sentence is disproportionate only in rare circumstances. *Id.* at 58. When a court is evaluating the proportionality of a sentence applied in a specific case, the court considers at least three factors: "(1) a comparison of the severity of the penalty and the gravity of the crime; (2) a comparison of the penalties imposed for other, related crimes; and (3) the criminal history of the defendant." *Id.*

In *Rodriguez/Buck*, the court determined that the sentences were disproportionate to the specific conduct that occurred in each of the cases. *Id.* at 79. In one of the cases that was consolidated for argument and disposition, the defendant pressed the back of a 13-year-old boy's head against her clothed breasts for about a minute. *Id.* at 51. In the other case, the defendant failed to move his hand away when a 13-year-old girl leaned her clothed buttocks against his hand more than once and then later used his hand to brush dirt off the back of her shorts. *Id.* at 51-52. The court explained that the sentences were disproportionate to the conduct in those circumstances because the contact was over the clothing, "minimal" and "brief," did not involve any "fondling, stroking, rubbing, or palpating," and there was no evidence of force or threats. *Id.* at 70. The court also compared the conduct in those cases to more severe conduct that receives the same sentence, including second-degree sodomy, second-degree rape, and second-degree sexual penetration. *Id.* at 75. Further, the court considered that neither defendant had any criminal history and that the conduct occurred on a single occasion. *Id.* at 78.

Turning to the facts of this case, we begin with the first factor. Defendant asserts that his conduct was similar to that in *Rodriguez/Buck* and that it is less grave because it did not involve forcible compulsion and because L was an adult. The state argues that defendant's conduct was more severe than that in *Rodriguez/Buck* because L was asleep and because defendant did not show any remorse immediately following the incident. Although we agree with defendant that his conduct is less severe than some conduct that would constitute first-degree sexual abuse because it

involves touching over the clothing and occurred on only one occasion, there are several facts that distinguish this case from *Rodriguez/Buck*. First, although the victim is an adult, which is contrasted to the child victims in *Rodriguez/Buck*, L was particularly vulnerable because she was asleep when the conduct occurred. Moreover, after L told defendant to stop, defendant masturbated in L's view immediately after the sexual abuse. Finally, the conduct involved more than fleeting contact—L testified that defendant was "groping" and "kissing" her while she was asleep, which is more severe than the contact that occurred in *Rodriguez/Buck*.

Turning to the second factor, we consider penalties for other, related crimes. Defendant points out that, as explained in *Rodriguez/Buck*, there is worse conduct that is subject to the same 75-month sentence, and the state agrees. The state, however, maintains that defendant's conduct was still more severe in this case than the conduct in *Rodriguez/Buck*. We agree with defendant's and the state's assertions that some conduct that constitutes first-degree sexual abuse is less severe than conduct that would result in convictions for other crimes with the same sentence. That conclusion, however, is not enough to render a sentence disproportionate unless the conduct falls at the "outer edge" of what constitutes first-degree sexual abuse. *See State v. Lara-Vasquez*, 310 Or App 99, 108-09, 484 P3d 369, *rev den*, 368 Or 561 (2021) (so stating). Because, as we explained above, defendant's conduct was more severe than that in *Rodriguez/Buck*, we conclude that it is not at the "outer edge" of the conduct that constitutes first-degree sexual abuse.

Finally, we consider the third *Rodriguez/Buck* factor, *viz.*, defendant's criminal history. Defendant contends that his criminal history weighs in favor of concluding that the sentence is disproportionate. Defendant notes that he has nine or 10 prior convictions for "minor crimes" including driving under the influence of intoxicants and inflicting corporal injury on a spouse, but no prior sexual offenses. The state argues that defendant's criminal history does not weigh in his favor because he has an extensive criminal history, and thus that the trial court did not err in giving

weight to the fact that defendant's previous criminal punishments had not deterred him from engaging in criminal conduct.

Defendant has a significant criminal history, including at least nine convictions, some of which involve domestic violence. Although defendant does not have any prior convictions for cases involving sexual conduct, his criminal history demonstrates that "previously imposed sentences have not deterred [him] from returning to criminal behavior." *Lara-Vasquez*, 310 Or App at 109. In sum, considering all the factors and relevant circumstances, we conclude that a sentence of 75 months for defendant's conduct is not the "rare" case that would "shock the moral sense" of reasonable people.

Lastly, we turn to defendant's challenge under the Eighth Amendment, which provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." For the reasons previously discussed, we conclude that defendant's sentence does not run afoul of his Eighth Amendment protections. *See State v. Wiese*, 238 Or App 426, 429-30, 241 P3d 1210 (2010), *rev den*, 349 Or 654 (2011) (explaining that an analysis of the three factors under Article I, section 16, provides a sufficient basis to decide whether the defendant's sentence was disproportionate and cruel and unusual under the Eighth Amendment); *see also Rodriguez/Buck*, 347 Or at 58-60.

Accordingly, because defendant's sentence does not violate the protections encapsulated in Article I, section 16, or the Eighth Amendment, the trial court did not err in sentencing defendant to the mandatory minimum 75-month sentence for first-degree sexual abuse.

Affirmed.